THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.* BIL-
LIE LEON PENDERGRASS, DEFENDANT AND APPELLANT.

No. 14128.
Submitted Sept. 11, 1978.
Decided Oct. 30, 1978.
Rehearing Denied Nov. 22, 1978.
586 P.2d 691.

Peter Meloy, argued, Helena, for defendant and appellant.

Mike Greely, Atty. Gen., Charles Gravely, County Atty., Mike T. McCabe, Deputy County Atty., argued, Helena, for plaintiff and respondent.

MR. CHIEF JUSTICE HASWELL delivered the opinion of the Court.

Defendant appeals from his conviction of attempted robbery and sexual intercourse without consent following a jury trial in the District Court of Lewis and Clark County.

Around midnight on June 26, 1977, the lone employee at Terry's Convenient Mart in Helena, Montana, was finishing her shift. She had let the last customer out the front door, locked it, shut off the outside lights, and was standing at the checkout counter writing a note to her employer. Suddenly, she was grabbed from behind by someone who put his right arm around her waist and his left arm around her shoulder, covering her face with his left hand which held a knife. A male voice told her not to scream or fight.

While forcing her to the back of the store, the man asked the girl where the key was. Thinking the man intended to rob the store, she replied, "It's a combination safe". He asked the combination and whether there was any money left in the cash registers.

The man then forced her into a restroom in the rear of the store and raped her. The girl, who had been told in a college course that a victim of such an assault should make every effort not to see her attacker, to minimize the danger of reprisal should he later fear he might be identified, kept her eyes averted and her hands over her face throughout the entire incident. She does not know what her assailant looked like.

After the rape, the man bound the girl's hands and feet with tie strings from a grocery apron and asked her where the key to the front door was. He left her lying on the restroom floor. After two unsuccessful attempts to find the key, he finally located it and left.

The girl, still bound and unclothed, hopped to the front of the store and contacted the police by telephone. It was 12:34 a.m.

When police officers arrived at the scene of the crime, a resident of the area informed them that an unfamiliar red pickup truck had been parked in front of his home. When a description was radioed in by the officers, a party in East Helena overheard the transmission on a scanner unit and thought he recognized the truck as being one from his neighborhood. He notified the city police. At approximately 2:30 a.m. the police, accompanied by the witness who had first described the truck, located the vehicle in an alley adjacent to defendant's residence.

Several witnesses placed this truck in the 1800 block on Ninth Avenue, one block south of the scene of the crime, during the period of time in which the incident occurred. One of the witnesses recorded the license plate number at that time. The recorded number matched that of plates issued to defendant. Defendant claimed to have been at his East Helena home at the time of the crime. Defendant's alibi was corroborated by three witnesses: his finance, his half-brother, and the half-brother's girlfriend, all who claim to have been present with him at his home during the time in question.

On the afternoon of June 27, 1977, some 32 hours after the incident had occurred, the victim of the assault was asked to come to the Helena police station. She was told that the suspect in the crime was going to be questioned, and was given the opportunity to overhear the conversation. The suspect and an officer were on one side of a room divided floor-to-ceiling by filing cabinets, with the girl stationed on the other side. The officer interrogated the suspect as to his activities on the night in question. The suspect was not asked to repeat any phrases that the victim had said her assailant used. He was not informed that the victim of the crime of which he was suspected was listening. When the girl was asked her opinion of the voice, she replied either "I think that is the voice", or "I believe that is the voice." The voice was that of defendant.

Approximately one week after the crime, a police officer contact-

ed a witness who had seen an individual park and step out of red pickup just before midnight on the evening of the occurrence. The witness observed the individual from across the street as the man walked from the truck and around the corner to Terry's Convenient Mart. The witness saw only the man's profile, but noted that he was stocky, with thick features, high cheekbones, and collar length hair.

A selection of six photographs was shown to the witness and he picked one out, explaining that "If I saw the individual face-to-face on the street I may not recognize him", but that the photograph he picked "most resembled the person I saw on that evening". The photograph was from the driver's license of defendant.

On July 13, 1977, defendant was charged with the crimes of attempted robbery and sexual intercourse without consent in the District Court, Lewis and Clark County.

The case came on for trial on October 3, 1977. On October 7, 1977, a jury found defendant guilty of both offenses. In a judgment entered on November 4, 1977, the District Court sentenced defendant to the Montana State Prison for 20 years for the crime of sexual intercourse without consent, and 40 years for the crime of attempted robbery, the sentences to run consecutively.

Defendant seeks reversal on the following grounds:

(1) That a tape recording by the police of the victim's call for assistance immediately following the incident should not have been admitted in evidence and played to the jury.

(2) That the pretrial photographic identification procedure violated defendant's due process rights and the identification of defendant thereby was inadmissible in evidence.

(3) That a photograph taken of defendant 18 days after the incident should not have been admitted in evidence.

(4) That the victim's voice identification was inadmissible in evidence.

(5) Insufficiency of the evidence to support defendant's conviction of attempted robbery.

Defendant contends that the tape recording by the police of the victim's telephone call for assistance immediately following the incident should not have been admitted in evidence and played to the jury. He argues that it had no probative value, but simply created sympathy for the victim without redeeming relevance to any issue in the case. He claims that the highly emotional nature of the recording created a climate of outrage in the minds of the jury denying him a fair trial.

The State argues that the tape was admissible to prove that a rape had occurred and bolstered the victim's credibility, her attention to detail, her ability to recall, and whether she had been placed in fear of her life. The State claims the tape is admissible as a public record or report under Rule 901(b)(7), Mont.R.Evid.

The trial court admitted the tape as evidence that the victim had been raped.

It is true that the tape tends to prove that the victim had been raped. She said she had been raped in the taped telephone call to the police. The tape shows that she reported the rape to the police immediately after it occurred. It showed that the victim was fearful that the perpetrator might return before the police arrived.

The State was required to prove that the victim had been raped. The State had overwhelming evidence of this fact aside from the tape at the time it offered the tape in evidence. The testimony of the victim, the medical evidence, the fact the victim was bound and was unable to free herself, the circumstances and locale of the crime, and the victim's clothing irrefutably prove a prima facie case of rape. This evidence was subsequently introduced by the State in its case-in-chief.

The credibility of the victim or the occurrence of the rape was never attacked by defendant. The defense was alibi—that defendant was elsewhere at the time of the crime and could not have committed it. This defense was noticed and known to the State in advance of trial.

The tape was highly prejudicial to defendant. Aside from any relevance heretofore pointed out, it contained emotional and near-

ly incoherent outpourings of the victim in the immediate aftermath of a violent crime. These utterances necessarily induced a feeling of outrage against the defendant and sympathy for the victim. Undue prejudice against defendant was created and a fair trial climate was destroyed by this tape.

At the suppression hearing, the trial judge first ruled the tape inadmissible. He recognized its inherent prejudice in these words:

"This is as highly inflammatory a thing as you could get before a jury and I think its probative value right now is nil . . . There may be room for doubt as to whether or not the victim was raped. If it appears at any time during the course of the trial, either during the State's case in chief, but particularly during the defense case in chief, we will permit this to be used in rebuttal, but that is the only probative value I can see . . ."

Later the trial judge reversed himself and admitted the tape. He stated the basis for his ruling in this language:

"The State is entitled to prove by whatever evidence they can get, each and every necessary part of the crime. One part of the crime is, of course, whether or not a rape was committed. Rape is a crime of outrage. Rape is a crime of hysteria and the State must be permitted to prove that with evidence and so the former ruling of the court that the transcript was irrelevant is erroneous."

We hold the admission of the tape in evidence under the circumstances of this trial was reversible error. Rule 403, Mont.R. Evid., provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." We recognize that the trial judge has a latitude of discretion in passing on the admissibility of such evidence. *State v. Bain* (1978), 176 Mont. 23, 575 P.2d 919; *State v. Rollins* (1967), 149 Mont. 481, 428 P.2d 462.

The foundation for admission of prejudicial evidence is a showing by the State to establish its substantial necessity or instructive value. *State v. Newman* (1973), 162 Mont. 450, 513 P.2d 258. Here there was no necessity or instructive value. The State had clear proof of a rape without the tape. There was no issue of

credibility. The only issues in the trial were identification and alibi. The probative value of the tape was substantially outweighed by its unfair prejudice. Rule 403, Mont.R.Evid. The admission of the tape and playing it to the jury was reversible error.

The case must be remanded to the District Court for a new trial and not dismissed. *State v. Langen* (1968), 151 Mont. 558, 445 P.2d 565; *State v. Kurland* (1968), 151 Mont. 569, 445 P.2d 570. For the guidance of the District Court on retrial, we address the remaining issues which may recur at the second trial.

■ Defendant contends that the pretrial photographic identification of the defendant violated his due process rights. He argues that of the array of photographs shown the witness prior to trial, only his photograph matched the description the witness had previously given the police.

We have examined the array of photographs and find defendant's contention without substance. His photograph is not the only photograph matching the description previously given by the witness. The array is not unduly suggestive in our view. ". . . [u]nless the error is obvious and the prejudice clear, the defendant's remedy is in effective cross-examination with the identification question then becoming one of weight to be determined by the jury and not one of admissibility." *State v. Miner* (1976), 169 Mont. 260, 546 P.2d 252. We find no error here.

■ Defendant also claims that a photograph taken of him 18 days after the crime in question was inadmissible in evidence.

The photograph was introduced to show a substantial change in appearance between the time of the crime and the time of trial. Defendant objected to its admission in evidence on the grounds of irrelevancy.

We hold the photograph was properly admitted. Where a picture is admitted to bolster the identity of a defendant whose appearance is substantially different at the time of trial than at the time observed by the witness, it is relevant. *State v. Harney* (1962), 160 Mont. 55, 499 P.2d 802.

The next issue raised by defendant is whether the trial court erred in admitting evidence of the voice identification.

▇ Although there are very few reported cases dealing exclusively with the question of "earwitness" identification as they are in visual identifications". *Harris v. State* (Ind.1978), 373 N.E.2d 149, 152. The United States Supreme Court has long been concerned with the inherent unreliability of eyewitness identification. That concern was most strongly expressed in a group of cases known as the *Wade* trilogy. *United States v. Wade* (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *Gilbert v. California* (1967), 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and *Stovall v. Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. The *Wade* trilogy established a rule that evidence of an identification obtained through unnecessarily suggestive procedures, when a fairer alternative was available, must be excluded *per se*. Unless there are exigent circumstances (as in. *Stovall*, where the witness was in danger of death), due process requires that identification procedures be conducted in such a manner as to eliminate as nearly as possible any suggestion in the confrontation that any one individual is intended to be picked out.

Subsequent cases, however, have not strictly applied the standards expressed in *Wade* and its companion cases, but rather have adopted a more lenient "totality of the circumstances" approach. Under this approach, the admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability. *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401.

The *Biggers* rationale was adopted by a majority of the Court in the most recent decision in the area, *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140. In *Manson*, the Court mandates weighing the corruptive effect of the suggestive procedure against the indicators of ability to make an accurate identification. That ability is to be gauged by the following standards: "The opportunity of the witness to view the criminal at the time of the .

crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." "Reliability", the court said "is the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. The inquiry is whether under all circumstances the suggestive procedure gives rise to "a very substantial likelihood of irreparable misidentification." *Manson*, 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155. (Citation omitted.)

■ Given the peculiar facts of this case, the test laid out in *Manson* is a difficult one to apply. The witness in *Manson* was a trained police officer who had spend five or ten minutes in face to face contact with a suspect in a dim hallway. The officer later recognized the suspect when a single photograph of him was left on the officer's desk. The totality of the circumstances appeared to the Court to have sufficient indicia of reliability to negate any possible due process violation inherent in the single photograph procedure. In the instant case, however, the reliability of the identification from the defendant's voice alone is considerably more suspect, and the due process inadequacies in the procedure considerably more blatant. There appear to be no exigent circumstances which preclude the use of a number of individual's voices for the witness to select from, rather than just focusing her attention on a single suspect. The police officer involved in the voice identification procedure in this case testified that he would never conduct a one-to-one voice identification again as he recognized the possibility of prejudice.

The record before us reflects that the trial court judge underwent a good deal of soul searching at his conclusion to allow the voice identification into evidence. He was clearly in a dilemma. Arriving at a determination in accordance with his interpretation of the recent United States Supreme Court decisions, he concluded that even though improper police practice had occurred, the Supreme Court standard of "very substantial likelihood of irreparable misidentification" had not been met. We disagree.

It is noteworthy that the trial judge construed the language "very substantial likelihood of irreparable misidentification" to imply that if proper cross-examination was had the due process inadequacies in the identification procedure might be negated. This reasoning is apparently founded on language in *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253, wherein the Supreme Court makes reference to cross-examination at trial exposing the jury to the potential for error in a given identification procedure. In *Simmons*, however, there were five eyewitnesses who had each individually made a photographic identification under procedurally deficient circumstances. With five eyewitnesses, the possibility of "irreparable misidentification" is extremely remote. With only one "voice" witness, as here, it is much more likely.

The Supreme Court has on several occasions noted the propensity of witnesses to rationalize initial unsure identifications so that by the time a trial takes place they are not likely to "go back on their word," Cf. *United States v. Wade* (1967), 388 U.S. 218, 229, 87 S.Ct. 1926, 1933, 18 L.Ed2d 1149, 1159. The misidentification will have become "irreparable", effective cross-examination or no. Taking that propensity into account together with the standards articulated in *Manson*, we conclude that defendant's motion to suppress evidence of the voice identification should have been granted.

Our conclusion is reached by a step by step application of the *Manson* criteria to the facts of this case:

(1) Opportunity of the witness to view the criminal at the time of the crime. Here, the witness never did "view" the criminal, but rather made a concerted effort not to do so. Her identification was based solely on the sound of his voice from remarks spoken over a period of approximately twenty or thirty minutes. There was testimony that the witness had had voice training and that she was therefore more capable of recognizing sounds than the average person. It was also argued that the trauma of the event may have indelibly etched the sound of that voice in her consciousness. We find

neither of these contentions persuasive enough to outweigh the effect of the unnecessarily suggestive confrontation.

(2) The witness' degree of attention. Again we point out that in *Manson* the witness was a trained police officer. He was utilizing the skills of his profession during the incident, whereas here the witness was, by her own testimony, trying *not* to identify her assailant.

(3) The accuracy of the prior description. In *Manson*, the description was so specific that a fellow officer was able to recall a photograph he had seen of the individual. Here the witness could testify to little more than that her assailant was a large person, probably under thirty, and with a normal, average voice.

(4) The level of certainty demonstrated at the confrontation. Rather than making an unequivocal statement at the time she made the identification, the response of the witness here was a qualified "I think that's the voice" or "That sounds like the voice".

(5) The time between the crime and the confrontation. This is the only one of the five *Manson* criteria paralleled by the circumstances present here.

We conclude that the totality of circumstances surrounding the voice identification made of defendant gave rise to a very substantial likelihood of irreparable misidentification. Due process requires exclusion of that evidence.

Counsel for appellant attacks the admissibility of the voice identification on a second ground which we will discuss to prevent future controversy.

Defendant cites 29 Am.Jur.2d Evidence § 368, for the proposition that voice identification evidence is only admissible where the witness has a familiarity with the voice from hearing it at some time prior to the event testified to, or where the voice has some peculiarity or distinctive quality. The State in rebuttal cites Rule 901 (b)(5), Mont.R.Evid., the Commission comment to which provides that a witness may "identify" a voice based upon familiarity *acquired at any time, whether before or after the speaker's voice is the subject of identification.*" The only recent case we have found

specifically on point supports the State's position that there need not have been any prior familiarity. In *United States v. Vitale* (8th Cir. 1977), 549 F.2d 71, *cert. denied*, 431 U.S. 907, 97 S.Ct. 1704, 52 L.Ed.2d 393, a case construing Federal Rules of Evidence, Rule 901(b)(5), which is identical to the Montana Rule, evidence of a voice identification was allowed although the witness had never heard the voice prior to the event testified to. No mention was made of any requirement that the voice must have some distinguishing characteristic. We adopt the rationale of *Vitale* as the rule in Montana.

The final issue raised by defendant concerns the sufficiency of the evidence to support the conviction of defendant on the charge of attempted robbery. "This Court remains ever mindful of one fundamental rule—that question of fact must be determined solely by the jury, and that given a certain legal minimum of evidence, this Court on review will not substitute its judgment for that of the jury . . . On appeal we examine the evidence to determine whether the verdict is supported by substantial evidence. In so doing, we will view the evidence in light most favorable to the State." *State v. Merseal* (1975), 167 Mont. 412, 415, 538 P.2d 1366, 1367-68. (Citing cases.) Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Merseal*, 167 Mont. at 416, 538 P.2d at 1368.

Our review of the record on this appeal persuades us that the substantial evidence requirement has been met. The fact that the assailant asked for the combination of the safe supports the inference that he intended to commmit a theft. The fact that he wielded a knife establishes that he knowingly or purposely placed his victim in fear of immediate bodily injury, an element of the crime of robbery. There was such relevant evidence as a jury might reasonably accept as establishing the elements of attempted robbery. Section 94-4-103(1), R.C.M.1947; section 94-5-401(1)(b), R.C.M.1947. The District Court did not err in denying defendant's motion for directed verdict on the attempted robbery charge.

The judgment of conviction is vacated and the cause remanded to the District Court for a new trial.

MR. JUSTICES DALY and SHEA concur.

MR. JUSTICE SHEEHY concurring in the dissent of MR. JUSTICE HARRISON which follows, and further dissenting.

The majority reverses the District Court on the very thin ground that the District Court erred in admitting into evidence a tape recording of the victim's voice as she telephoned the police for help immediately following the exit of her assailant from the scene.

The majority concludes the tape recording's value as probative evidence is outweighed by its prejudicial effects for two reasons; one, the tape was unnecessary to prove the rape, and; two, there was no issue on credibility. I believe both reasons are incorrect.

The claim the tape was unnecessary to proving the crime is answered by the trial court itself when it decided to admit such evidence. Judge Bennett said, in addition to the quote set forth in the majority opinion:

". . . so the former ruling of the Court that the transcript was irrelevant was erroneous. It is relevant. It is highly relevant on the question of whether or not the offense was committed. I thought of permitting the defendant to concede both in argument and on the record that a rape was committed. That won't do. We cannot ask and we will not permit in this particular case the defendant to concede any part of the necessary elements of the crime. In view of that, in view of the relevance of the testimony, the strong relevance of the testimony, it is not possible to rule that the inflammatory nature of the proposed presentation overbalance the relevancy and for that reason, I will permit the prosecution to use the tape that was proposed yesterday in its entirety."

The spontaneous tape report of the victim so soon following the incident was part of the *res gestae*. See *State v. Shambo* (1958), 133 Mont. 305, 310, 322 P.2d 657. It was indeed highly relevant and admissible, Rules 401, 402, M.R.Evid. She had crawled and hopped, bound hand and foot, to a phone on the counter in the store,

where she unhooked the receiver with her teeth and pressed the operator button with her nose to complete her call.

The second reason relied on by the majority is there was no issue of credibility related to the tape. If the tape were to be considered only in the context of whether a rape was committed, this might be granted, but there was a definite issue of credibility in the victim's testimony as to her reliability in the later voice identification of defendant. The cross-examination of the victim regarding what she heard of the assailant's voice centered almost wholly on that issue. The probative value of the tape recording relates to the issue of her reliability in the voice identification because the tape recording shows the sharpness of her mental powers, under a nerve-rattling experience. The recording proved that under very trying circumstances she clearly, though shakenly, could recall telephone numbers, people who should be informed, and her fear that a male policeman might find her undressed. The tape proved that her attention to detail was sufficient to support her later voice identification.

But the focal legal point not addressed by the majority opinion relates to a basic rule of appellate consideration where admissibility of evidence such as the tape recording is concerned. The majority admits the District Court has "latitude" of discretion in admitting evidence, but it does not give the District Court the benefit of that latitude. In fact, the appellate rule is more favorable to the District Court: its determination in admitting evidence will not be disturbed on appeal unless there is a *manifest abuse* of discretion. *State v. Sharbono* (1977), 174 Mont. 552, 563 P.2d 61, 68; *State v. Caryl* (1975), 168 Mont. 414, 543 P.2d 389; *State v. Medicine Bull, Jr.* (1968), 152 Mont. 34, 445 P.2d 916.

In the light of the careful consideration given its ruling by the District Court, no manifest abuse exists here.

Having decided to reverse because of the tape recording, the majority then proceeds to pull the teeth of the State's case in any retrial of defendant: it voids the voice identification of defendant by the victim. This is accomplished by weighing the factors of *Man-*

*son*, and finding against the reliability of the identification. However, the District Court weighed these same factors, and reached an opposite conclusion, not from a written record alone, but after having heard the witnesses. Hear the soliloquy of the District Court.

"THE COURT: I think that we have gone far enough in the testimony for the complaining witness to reach a conclusion on the admissibility of her vocal identification and we will now announce a decision that I disagree with in my heart and that upsets every legal precedent in this area that I have ever heard of, that is will be pursuant to *Manson v. Brathwaite*. That is, I cannot find as a matter of law, a very substantial likelihood of irreparable misidentification. This identification is the product of what I deem as improper police practice, which forces in effect, or tends to force, or could force a conclusion on a complaining witness by the law that existed before *Manson v. Brathwaite*. There is no question that it would have to be excluded under the unnecessary suggestive per se rule. We no longer can exclude evidence strictly on that per se basis. We must, in fact, condone bad investigations. If we can find in the totality of the circumstances, as I take it, revealed in the testimony and special hearings on the question that there was sufficient reliability under the rule stated—and we are given extremely shaky guidelines for determining that reliability—we may weigh against these guidelines the corrupting effect of the suggestive identification and I am waiving the corruptive suggestive identification in this case.

"The standard is very difficult for one to surmount, or even to understand at this stage until it's further illuminated by the patron of it. The United States Supreme Court—I don't know what a very substantial likelihood of irreparable misidentification is, but by irreparable, I am sure from the context in which the ruling is made, that there is no possibility of overcoming the misidentification by cross-examination. I suspect that there may be a possibility here of overcoming the misidentification by cross-examination or the effect of misidentification, if there is any. This case can be distinguished from *Manson v. Brathwaite* in a myriad of ways and I

wouldn't take up the record space to define them, but focusing on the guidelines that have been improperly borrowed from Simmons or from Biggers, as was pointed out by Justice Marshall in his decision, but which we must follow—they have, they say, the opportunity of the witness to hear the criminal at the time of the crime is admissible. She had many opportunities to hear her assailant. That is unchallenged, uncontradicted testimony, that for something like 20 to 25 minutes, perhaps a half-hour, from time to time the witness had an opportunity to hear the voice of her assailant clearly and in many tones and timbers. The degree of attention, the only thing that could interfere with the degree of attention here, was her hysteria. I think it's quite clear that the complaining witness had an opportunity to hear and guage the sound of the voice before that hysteria, if any, set in. Her perception and attention might have been sharpened by the circumstances themselves, the deprivation of sight may have heightened the witness' ability to attend the voice, the accuracy of the prior description of the criminal. I think that we should consider the accuracy of the prior description of the voice. It was vague. It led nowhere, actually. We can't rely in following these guidelines on any accuracy of the prior description of the criminal's voice. Level of certainty was demonstrated at the confrontation. We have that by testimony here in this special hearing and it can be traced, of course, to the weakness of the rule that we must follow. Of course, at this stage the complaining witness is certain that this is the voice. How else would she be? She has committed herself to that position, which is not to suggest that she's in any way, or has in any way, fabricated anything. To suggest that during the course of this whole proceeding, from the beginning on, there is all kinds of clauses that could be settled starting from the place where she said, 'It seems to be the voice. That is a long, long ways, but for the purposes of what we have to consider we must face the fact that the witness is now saying that that is the voice and I will never forget it, and of course, the time between the crime and the confrontation is a very short, short time, although it is possible that it could become a factor. I'd concede that the shortness is a plus factor in finding of reliability. That is the best that I

know how to apply these things. I add the general observation on direct examination of the witness as well as the cross-examination, which reveals a witness that is quite astute and very sensitive to what is going on and on the occasion of the attack she witnessed with amazing acuity what was happening to her and what was going on. Her testimony as to what went on is practically untouched by cross-examination. It is clear and it is uncontradicted. "Perhaps the final stroke and one that we cannot ignore in evaluating the reliability is that this happens to be a person that is trained in voice evaluation. There is no contradiction of that. We have to believe that when she wants to, she can gauge voices, classify them, understand them and distinguish them. There isn't any evidence to the contrary and it's persuasive to the point that we must receive her testimony as reliable under the guidelines that we have. You may continue to examine, Mr. McCabe, on the voice."

The agony, but the thoroughness, with which the District Court weighed the factors of *Manson* to determine the reliability of the voice identification is manifest in the foregoing statement. It is also manifest that the Court did not abuse its discretion in determining that the voice identification was admissible.

We note that one of the *Manson* factors on which the majority relies and finds against the identification is the factor of the "witness' degree of attention." It is not precise to say "the witness was, by her own testimony, trying *not* to identify her assailant." That statement overreaches, because she was only trying not to look at her assailant. Nothing blocked her ears, and impressions received through the sense of hearing are *facts* on which a witness may testify. See *State v. Vanella* (1910), 40 Mont. 326, 106 P.364.

The circumstances here that the victim averted her eyes so as not to look at her attacker probably saved her life, so it should not be decried. The intention of defendant to rob the store and gain her body was as keen as the knife he pressed across her right eye to enforce his will. He had her full attention.

In my opinion, the reliability of the voice identification was a judgment call, and the jury has made that call. The evidence sup-

ports their decision, and as the District Court said, the victim had remarkable powers of observation. By avoiding the identification, this Court has taken away the only evidence the State has that put defendant in the store with the victim at the time of the crime.

I would affirm the conviction on both counts.

MR. JUSTICE HARRISON dissenting:

I dissent.

The majority relies on six United States Supreme Court cases in deciding whether the voice identification procedure utilized by the Helena police force was so suggestive as to violate defendant's right to due process. To the extent my colleagues explore these cases, I feel their conclusions have merit. But a fuller picture and a different result emerge when these cases are subjected to closer scrutiny. Because a holding excerpted from the context in which it is developed is often misleading, I will address each case individually. First, however, I will mention two cases not addressed by the majority which, unlike the cases relied on, are based on factual situations nearly identical to the instant case.

*Roper v. Beto* (5th Cir. 1971), 454 F.2d 499, cert. den. 406 U.S. 948, 92 S.Ct. 2053, 32 L.Ed.2d 336 (1972), involved an aural, rather than visual, identification of a defendant by his victim. There a woman entering her apartment was grabbed from behind by an assailant holding a butcher knife against her throat. He then ordered her to place adhesive tape over her eyes so she would not be able to see him. After tying her to her bed and raping her, the defendant continued to talk to her for about 35 minutes before departing. When the defendant was arrested three days later, the victim was brought to the police station and positioned near the door of the room in which the defendant was being questioned. She identified the voice as that of her attacker.

The court in *Roper* considered all the cases relied on by the majority in this case with the exception of *Mason v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, which had not yet been decided by the Supreme Court. The court stressed that

"[t]he particular concern of the courts is whether the showup has produced reliable identification evidence or the likelihood of misidentification." *Roper v. Beto*, 454 F.2d at 502. The court went on to say, "courts require more than the fact of a one man showup to find a denial of due process in admitting at trial . . . identification testimony based on a pretrial confrontation." *Roper*, 454 F.2d at 502. The court looked for additional factors of suggestiveness and found none. As a result, the court found that "if the confrontation itself is not found improper the validity of a resulting voice identification should be left for the jury." *Roper*, 454 F.2d at 503. The court concluded that "[under] the totality of the circumstances of this case, the identification procedure was not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." 454 F.2d at 503.

The second case not mentioned by the majority is *State v. Johnson* (1976), 138 N.J.Super. 579, 351 A.2d 787. That case, like *Roper*, involved a factual situation quite similar to the instant case. There a woman was asleep in bed when she was awakened by a man's voice and the sensation of his covering her head with a piece of clothing so she could not see him. The man raped her and then talked freely for the thirty minutes he remained in the room. The next day, the victim was asked to come to the police station to see if she could identify the voice of a suspect as the voice of her attacker. Standing near the door of the room in which the defendant was being questioned, without being able to see him, she identified his voice. Using the factors to be weighed in the context of the totality of the circumstances in considering the reliability of an identification as delineated in *Neil v. Biggers* (1972), 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411, the court concentrated on the degree of reliability of the identification and found it supported by credible evidence. The court went on to note that "[s]uggestibility in itself is not fatal. [Citation omitted.] It is only when that suggestibility in confrontation reaches impermissible or unfair limits that the pendulum swings to a finding of unreliability." *State v. Johnson*, 351 A.2d at 790.

126

With the above two cases in mind, I now address each of the six cases relied on by the majority.

The issue in *United States v. Wade* (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, the first case in the *Wade* trilogy, was ". . . whether courtroom identification of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trial at a post-indictment lineup conducted for identification without notice to and in the absence of the accused's appointed counsel." *Wade*, 388 U.S. at 219, 87 S.Ct. at 1928, 18 L.Ed.2d at 1153. The Supreme Court, hinging its opinion on the defendant's Sixth Amendment right to counsel, held that the defendant's conviction for robbery should be vacated pending a hearing to determine whether in-court identification made by witnesses had an independent source, or whether, in any event, the introduction of the evidence was harmless error.

In *Gilbert v. California* (1967), 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, the Supreme Court found that unless certain in-court identification of the defendant by a number of witnesses in his robbery and murder trial could be found to have an independent source other than a tainted lineup procedure in which defendant was not afforded counsel, the court would impose a *per se exclusionary rule* as to such testimony. The court felt this would be the only "*effective sanction* to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup." (Emphasis added.) *Gilbert v. California*, 388 U.S. at 273, 87 S.Ct. at 1957, 18 L.Ed.2d at 1186.

In *Stovall v. Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, the Supreme Court found that a one-on-one identification of defendant by his victim from her hospital bed would not be excluded under the emergency circumstances of that case. The court stated that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." *Stovall v. Denno*, 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206.

*Simmons v. United States* (1968), 390 U.S. 377, 381, 88 S.Ct.

967, 970, 19 L.Ed.2d 1247, 1252, involved a claim by the defendant "that his pretrial identification by means of photographs was in the circumstances so unnecessarily suggestive and conducive to mididentification as to deny him due process of law . . ." The Court pointed out that Simmons' reliance on the rule in *Wade* and *Gilbert*, that the manner of an extrajudicial identification affects not just the weight but the admissibility of identification testimony at trial, was misplaced. The Court noted that the rationale in those cases was "that an accused is entitled to counsel at any 'critical state of the prosecution' and that a post-indictment lineup is such a 'critical state.'" *Simmons*, 390 U.S. at 383, 88 S.Ct. at 970, 19 L.Ed.2d 1252. Since Simmons was not contending he was entitled to counsel at the time of the identification, the Court evaluated his claim in light of the *Stovall* rule considering the "totality of surrounding circumstances". The Court then held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was *so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.*" (Emphasis added.) *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253. Applying the *Stovall* standard, the Court denied Simmons' claim.

The right to counsel at a critical state of prosecution, which the Court has found a lineup to be, is linked to the danger of law enforcement officers presenting a suspect in such a suggestive manner, e.g., with handcuffs, among other dissimilar individuals, or in prison garb, that the manner of presentation influences the witness to the extent that he identifies someone as the perpetrator of a crime, not because he remembers or recognizes him, but because he appears to be the logical choice at the time of the lineup. Presence of counsel at a post-indictment lineup assures that any suggestive procedure utilized could be brought to the jury's attention through cross-examination.

At this point a reference to the instant case seems appropriate,

since there is little dispute about what happened at the identification. The rape victim identified defendant by hearing his voice. She did not see him at the time of the identification and in no way could have been prejudiced by his appearance. Defendant, throughout the conversation which the victim listened to, was not asked to repeat any specific "damning phrases" or any phrase used during the commission of the crime. I admit that the analogy between "earwitness" and "eyewitness" identification is convenient for purposes of legal analysis, but it is not without distinctions with respect to the possibilities for suggestiveness. This becomes increasingly apparent as we examine further the cases cited in the majority opinion.

In *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, the Supreme Court found that a rape victim's visual identification of her assailant when two detectives walked the defendant past her and had him repeat the words "shut up or I'll kill you" would not be excluded because of an over suggestive misidentification procedure. In that case the Court applied the standard of "a very substantial likelihood of irreparable misidentification" to a suggestive "out-of-court identification". *Biggers*, 409 U.S. at 198, 93 S.Ct. at 381, 34 L.Ed.2d at 410. It then considered "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive", *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382, 34 indicators of reliability, "no substantial likelihood of misidentification. The evidence was properly allowed to go to the jury." 409 U.S. at 201, 93 S.Ct. at 383, 34 L.Ed.2d at 412. The factors the Court considered were: (1) opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199, 93 S.Ct. at 383, 34 L.Ed.2d at 411.

*Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, involved the identification of a narcotics vendor by

an undercover police officer. The defendant argued that the identification was unreliable because the officer only examined one photograph which was, he asserted, unnecessary and suggestive. The Court agreed that the procedure in *Manson* was suggestive, but pointed out that the "per se rule . . . goes too far since its application automatically and peremptorily, without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant." *Manson*, 432 U.S. at 112, 97 S.Ct. at 2252, 53 L.Ed.2d at 152. The Court went on to say that "inflexible rules of exclusion, that may frustrate rather then promote justice, have not been viewed recently by this Court with unlimited enthusiasm." 432 U.S. at 113, 97 S.Ct. at 2252, 53 L.Ed.2d at 153. The Court then concluded "that reliability is the linchpin in determining the admissibility of identification testimony." 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.

It appears to me that the majority attempts to apply the *per se exclusion*, expressly disavowed by the United States Supreme Court, when it ignores the weight of the factors of reliability present in the instant case. I will now turn to the instant case and examine the reliability of the voice identification measured by the criteria outlined in *Biggers*.

1. *Opportunity to view the criminal at the time of the crime.* The commission of the crime in this case lasted approximately thirty minutes during which time defendant spoke almost continuously. He in no way attempted to disguise his voice giving the victim more than an ample opportunity to become familiar with it. There is no question that this factor weighs in favor of reliability.

2. *The witness' degree of attention.* That the victim feared for her life when she glimpsed the blade of the knife pressed against her face is unquestioned. For most of the attack, with her eyes covered, she listened closely to every word uttered by her attacker, her senses sharpened by fear. This factor weight heavily in favor of reliability.

5. *Length of time between the crime and the confrontation.* In this case only thirty-two hours passed between the time of the of-

fense and the identification. The incident and the voice of the defendant were painfully fresh in the memory of the victim. this factor, too, weighs heavily in favor of reliability.

At this point, the factors favoring reliability are well supported by the circumstances of this case and weigh in favor of admitting this testimony, subject to cross-examination as to the circumstances of the identification. The final two factors required further development as my colleagues seem to have difficulty with them.

3. *The accuracy of the witness' prior description.* Here the victim described the cloth of defendant's trousers, his hands, his arms, the smell of gasoline that accompanied him, and his voice. She described his voice in a reasonable manner. There were no peculiar qualities; it was a young man's voice. That she could not describe a voice as graphically and colorfully as visual perceptions are described does not detract from her reliability. There was nothing inaccurate about her description of the voice, and the fact she was unable to describe the voice more specifically than we ordinarily describe aural perceptions does not weigh against reliability.

4. *The witness' level of certainty.* Counsel for appellant overemphasizes the significance of the words used by the victim when she identified the voice of her assailant. Exactly what those words were is a matter of some disagreement, but they were something like "that sounds like the voice". Subsequently, she testifed under oath that she was certain it was the voice. The majority interprets her words as words of hesitation and finds in that moment of hesitation a "very substantial likelihood of irreparable misidentification". I cannot agree. It is significant to note here, when considering the suggestive nature of the identification procedure, that the officers had mentioned the suspect's name to the victim prior to her identification of his voice. Though she was not familiar with defendant, she did know someone with a similar name who, she felt, could not have been her attacker. As a result, before she could say "that is the voice", she had to overcome her initial feeling that this would not be the person who attacked her. Identifying someone as the perpetrator of a violent and vicious crime is not something one does off-

handedly. The victim here acted responsibly and tried to insure her own reliability by not becoming anxious to "pin this on someone". In this light, her initial hesitation, if in fact we can read it as hesitation, weighs in favor of reliability. Moreover, hesitancy or uncertainty on the part of a witness identifying an accused by voice recognition affects only the weight and not the admissibility of his testimony. *State v. Vanella* (1910), 40 Mont. 326, 106 P. 364. By the general rule, the weight of voice recognition testimony is a question of fact for the jury's determination. *United States v. Moia* (2d Cir. 1958), 251 F.2d 255.

Apart from the one-on-one nature of the confrontation in this case, defendant argues that the police procedures involved were unnecessarily suggestive when the police told the victim they had a "suspect" in custody. This is obviously without merit. Why else would they ask her to come to the police station to listen to a voice? This question was addressed in *People v. Harrison* (1978), 57 Ill.App.3d 9, 14 Ill.Dec. 636, 372 N.E.2d 915. There, the fact that the police told the victim they had a suspect in custody did not establish too suggestive a procedure in that whenever a victim of a crime is asked to come to the police station to look over suspects, there is the unavoidable intimation that the police have someone in custody who might be the perpetrator of a crime. There was nothing in the record to support the assumption that the witness was influenced by the knowledge that a suspect was in custody. Likewise, there is no evidence in the instant case that this victim was influenced by similar knowledge.

It should be mentioned that Rule 901, Mont.R.Evid., supports the admissibility of this testimony:

"Requirement of Authentication or Identification

"(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

"(b) Illustrations. By way of illustration only, and not by way of

132

limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

" . . .

"(5) Voice identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

Finally, I would again emphasize that "it is the danger of misidentification, rather than the mere occasion of suggestion, that constitutes basis for exclusion of the identification evidence." *Baxter v. State*, (Fla.App.1978), 355 S.2d 1234, 1237.

In the final analysis, I would uphold the District Court's determination that the voice identification evidence with respect to the circumstances surrounding the identification.

With respect to the other issues presented, I concur in the dissent of Justice Sheehy.