No. 81-456

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

_____

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

RORY RAYMOND JOHNS,

Defendant and Appellant.

_____

Appeal from: District Court of the Fourth Judicial District,
In and for the County of Missoula
Honorable John Henson, Judge presiding.

Counsel of Record:

For Appellant:

Anthony F. Keast, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert L. Deschamps III, County Attorney, Missoula,
Montana

_____

Submitted on briefs: September 21, 1982

Decided: November 9, 1982

Filed: NOV 9 - 1982

_____Thomas J. Kearney_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant-appellant was arrested and charged with deliberate homicide after shooting his brother on December 2, 1980. On March 10, 1981, defendant was found guilty of deliberate homicide by jury verdict in the Fourth Judicial District, County of Missoula. Defendant appeals.

Defendant was arrested and charged with attempted deliberate homicide after shooting his brother, Larry Peter Johns, on December 2, 1980. Defendant shot Larry at the family residence in the presence of Myrsta Johns, the sister, and Sara Johns, the mother. Larry died after the attempted charge had been filed.

Defendant and Larry had a history of constant fighting and bickering. The two made threats upon each other's lives over a period of years. The Missoula city police had been called to break up domestic disputes between defendant, Larry and Myrsta on a regular basis. Defendant testified that Larry had attempted to kill him in the past although the attempts were unsuccessful. Most of the disputes arose out of the need for drugs or money.

Defendant and Larry owned an ample supply of weaponry which was confiscated by the police department for a period of time. At the time of the shooting, the bedroom of the brothers could have armed a strike force of the local police.

Defendant, Larry, Myrsta and Sara Johns all have a history of drug abuse and psychological problems. Defendant admits to having been addicted to drugs since he was eleven or twelve years of age. Larry and Myrsta have had a similar history with drugs.

On the Saturday before the shooting defendant and Myrsta, (the sister), visited the residence of their brother and sister-in-law in Missoula. The defendant told his sister-in-law, Marlynn Johns, that something had to be done because he couldn't live with Larry anymore. Marlynn Johns testified that defendant told her he was going to kill Larry and stated, "AR, Larry AR. I am going to get you this time." Marlynn did not know what "AR"

meant but did not get concerned at the time because she was accustomed to the usual rambunctions of the two brothers. On December 2, 1980, defendant shot Larry with an AR-15, semi-automatic rifle.

The events leading up to the shooting were described only by defendant. He testified that Larry, himself and three others had been working at odd jobs in Lewiston, Idaho. On December 2, 1980, the group decided to leave Lewiston and return to Missoula. Apparently, Larry did not want to leave Lewiston, but rather, wanted to stay and make some more money. This precipitated another dispute between the brothers and defendant testified Larry stated he was going to kill him when they returned to Missoula. Defendant claims although the two returned to Missoula in different vehicles, Larry continued to make threats to defendant over a CB radio. When one vehicle ran out of gas on Lolo Pass, defendant went into a bar to wait and consumed approximately two six packs of beer and took several drugs including Demerol, Nebutol, Parest, Soma, Valium and Traxsene. Defendant testified he took the alcohol and drugs because he was in a very exicted state after Larry's threats.

Concerning the events after the brother's arrived at their home in Missoula, two different stories develop--that of defendant and those of the mother and sister. Defendant testified that Larry and he first entered the house carrying some of their luggage. Defendant then returned to get the rest of his luggage and when he returned to the house Larry confronted him with a knife in one hand and a .357 magnum pistol in the other. Defendant attempted to run but Larry blocked his escape. After a brief scuffle in the kitchen, defendant ran to the bedroom and retrieved the AR-15 rifle from the wall. Defendant claims they struggled in the bedroom and out into the kitchen. Then Larry ran into the mother's bedroom and defendant followed. After another struggle, defendant turned and saw Larry pointing the .357 pistol at him. Defendant claims Larry stated, "This time I

- 3 -

am blowing you away." Defendant ran to the living room and shot Larry who was still standing in the bedroom. Defendant testified that Myrsta then sheathed Larry's knife and returned the .357 pistol to its holster in the kitchen. No fingerprints were ever taken from the .357 pistol.

Myrsta and Sara Johns have a different explanation of what transpired when the brothers arrived home. They testified that the brothers came in together and Larry stated he was hungry. Larry took a doughnut from a breadbox and sat down to eat it in the living room. Defendant went into the bedroom and returned with the .357 pistol stating, "this is for self-defense." Defendant then placed the pistol on a table near the kitchen and returned to the bedroom and took the AR-15 rifle from the wall. When Larry saw defendant with the rifle he fled to the mother's bedroom. Defendant followed to the doorway of the living room and shot him.

Myrsta and Sara Johns admit their recollection of the shooting is not competely clear. Sara was in poor physical and mental health at the time of the shooting and went into shock thereafter. Myrsta admits to having been under the influence of drugs at the time of the shooting and had been undergoing treatment for her drug problem at Warm Springs at the time of trial.

After the shooting, Myrsta called the 9-1-1 emergency number for an ambulance. This call was recorded and depicts an unsavory scene at the Johns' house. Myrsta is yelling hysterically into the phone and defendant can be heard in the background shouting profanities and firing the rifle.

An off-duty ambulance driver, Thomas Ziegler, heard the ambulance call on his scanner and drove to the scene to assist. When he arrived, Sara was in front of the house screaming for help. As Ziegler stepped out of his car he saw defendant step into the doorway of the house and point a rifle at him. Ziegler then ran to a neighbor's home to warn the ambulance driver not to stop at the Johns' residence until the house was secured. The

- 4 -

ambulance did not stop at the house, but parked about one and one-half blocks further down the street.

When deputy sheriff Larry Jackson arrived, Myrsta was shouting from the doorway and Jackson could see defendant in the background holding the AR-15 rifle. Jackson cautiously approached defendant and asked him to put the gun down. By that time a second officer, Scott Graham, had arrived and was approaching behind Jackson. Eventually defendant unloaded the gun and turned it over to the police officers.

Larry was attended to at the scene and later died at St. Patrick's Hospital as a result of the gunshot wounds. The coroner's report showed Larry received six gunshot wounds. The AR-15 rifle was fired approximately fourteen times. Some of the bullets were found lodged in the walls and ceilings. After Larry's death the information was amended charging defendant with deliberate homicide.

During the trial, the court admitted the 9-1-1 tape into evidence and allowed it to be played to the jury on four separate occasions. On March 10, 1981, the jury found defendant guilty of deliberate homicide. Defendant appeals his conviction.

The issues raised on appeal are as follows:

1. Whether the District Court erred in admitting the 9-1-1 tape into evidence?

2. Whether the District Court erred in allowing the prosecution to make comments concerning the trajectory of the fatal bullets during closing statements?

3. Whether the District Court erred in allowing the testimony of the mother and the sister when it was revealed they suffered from mental, emotional and drug-related illnesses.

Defendant argues the admission of the 9-1-1 tape was in error in that the tape was inflammatory and that its admission was prejudicial. Rule 403, M.R.Evid., states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Here, the trial court ruled that the tape was admissible because its probative value outweighed the danger of unfair prejudice. Under our rules of evidence the trial judge has a latitude of discretion in passing on the admissibility of such evidence. State v. Pendergrass (1978), 179 Mont. 106, 586 P.2d 691; State v. Bain (1978), 176 Mont. 23, 575 P.2d 919. The foundation for admission of evidence is a showing by the State to establish its substantial necessity or instructive value. State v. Pendergrass, supra; State v. Newman (1973), 162 Mont. 450, 513 P.2d 258.

In the present case the trial court denied defendant's motion to exclude the tape stating, "I believe that their [Myrsta and Sara Johns] credibility concerning the events that occurred after the shooting has, in effect, been used to question their credibility as to the actual events of the shooting." Defendant argued at the trial that he shot his brother in self-defense. The testimony of Mystra and Sara Johns showed that the defendant did not act in self-defense, but rather, was the aggressor in the confrontation. Defendant's actions after the shooting which were recorded in the 9-1-1 call were quite violent. Defendant continued to fire the rifle and he can be heard commanding Myrsta, "do not move!" as she was calling for an ambulance. At the trial the State argued that these actions were not consistent with defendant's claim of self-defense. For that reason the probative value of the tape outweighed the chance of prejudice to the defendant.

Defendant argues Pendergrass, supra, is controlling. However, Pendergrass is distinguishable from the case at hand. In Pendergrass the trial court admitted a rape victim's call for assistance. There the tape was admitted for the purpose of showing that a rape had been committed. However, the defendant

had never disputed that a rape had occurred. Defendant claimed he was elsewhere at the time of the crime and thus his defense was alibi. Therefore, the admission of the tape had no probative value and was highly prejudicial to the defendant. The State had overwhelming evidence to prove that a rape had occurred and the admission of the tape only induced a feeling of outrage against the defendant. Here, as stated above, the tape was admitted to give credibility to the sister and mother's testimony and thus was admissible.

Defendant claims the State's comment during closing arguments that one particular wound had to have been inflicted while Larry was lying on his back constitutes reversible error. Defendant argues since there was no expert testimony during trial as to the nature of the wound the comment was prejudicial. Defendant did not object to the statement during closing arguments. It is well settled that objections to closing arguments, made for the first time on appeal, come too late. Hawkins v. Crist (1978), 178 Mont. 206, 583 P.2d 396.

Defendant's last claim is that the District Court erred by allowing the testimony of the mother and the sister when it was revealed they suffered from mental, emotional and drug-related illnesses. Defendant argues the trial court should have disqualified the witnesses upon its own motion. Defendant did not move to disqualify the witnesses at trial. This Court has repeatedly held that we will not consider questions of claimed error not previously raised or presented to the trial court. Northern Plains Resource Council v. Board of Natural Resources (1979), 181 Mont. 500, 521, 594 P.2d 297, 309; Hayes v. J.M.S. Const. (1978), 176 Mont. 513, 579 P.2d 1225.

Judgment is affirmed.

_____
Justice

- 7 -

We concur:

_____
_____
_____
_____
Justices

- 8 -