No. 12274

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

_____

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

G. M. NEWMAN, a/k/a
JACK NEWMAN,

Defendant and Appellant.

_____

Appeal from: District Court of the Eighteenth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

Morrow, Nash and Sedivy, Bozeman, Montana.
James H. Morrow, Jr. and Edmund P. Sedivy, Jr. argued,
Bozeman, Montana.
Seth F. Bohart, Bozeman, Montana.

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana.
Jonathan B. Smith, Assistant Attorney General, argued,
Helena, Montana.
Thomas A. Olson, County Attorney, argued, Bozeman,
Montana.

_____

Submitted: April 26, 1973

Decided: JUL 2 5 1973

Filed: JUL 2 5 1973

_Thomas J. Kearney_
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This appeal is brought by defendant G. M. Newman, also known as Jack Newman, from his conviction of involuntary manslaughter in connection with the death of his wife, Elsie Newman, in the district court of the eighteenth judicial district, Gallatin County. He appeals from the final judgment and sentence of seven years imprisonment.

The Newmans were married in 1937. At the time of her death Elsie Newman was 53 years of age, Newman was 56 years of age. The Newmans owned and operated a moving and storage business in Bozeman known as Lux Transfer and Storage Company. Prior to the fall of 1971, Mrs. Newman handled the office portion of the business, including books and accounts.

From the testimony it appeared that in recent years Elsie Newman began drinking excessively and had attempted to conceal her drinking from others, including her husband. Also in recent years her health had been poor; she was considerably overweight; suffered from a blood anemia condition; had a hiatel hernia; had a swelling and loss of feeling in her legs related to a broken leg sustained in the fall of 1967; and had a fluid retention condition.

From the record, it appears that although Mrs. Newman was advised by her doctor, family and friends to quit drinking she refused their advice and refused to admit she had a drinking problem. She fell behind in the office work at Lux Transfer. In May 1971, Mrs. Donna Harris, the only child of the Newmans, was asked by her father to come from her home in Kansas to help bring the office work up to date. Mrs. Harris testified that during the period of about three months she assisted her parents in their business she found bottles of liquor hidden in the home and in the office. She stated her mother constantly smelled of

alcohol and on one occasion she found her mother passed out behind the wheel of the family car. Other witnesses testified as to Elsie Newman's drinking including a former housekeeper who testified she purchased five bottles of whiskey per week for Elsie Newman.

The daughter stated she sought information from the Gallatin county attorney about alcoholic rehabilitation for her mother but that her mother would not voluntarily commit herself. She and her father decided not to go forward with an involuntary commitment.

In July 1971, Mr. Newman hired a Mrs. Richards to take over the office work of Lux Transfer. He attempted to combat his wife's drinking problem by keeping the car keys from her, limiting the amount of money she was able to spend and contacting various bars and the taxi company requesting that they not provide her with liquor. She was forbidden to go to the beauty parlor when it was discovered she was obtaining liquor from her hairdresser.

Newman testified: that on Thursday, November 18, 1971 his wife had been drinking and had fallen three separate times in the home that day. She fell twice in the kitchen and once in the bedroom. He assisted her in the kitchen but after the fall in the bedroom she was holding her head but indicated that she was all right. That on the next evening, Friday, November 19, 1971, upon entering the home he noticed the back steps were pulled loose and the handrail pulled over. His wife had a bruise on her forehead and she explained she had fallen on the back steps, bumping her head. She stated her head hurt a little but that she thought it would be all right.

Later during the evening of Friday, November 19, he questioned his wife about a letter he had received from a bank

in Idaho notifying him that a joint savings account containing about $200 had been closed. Newman stated his wife was uncooperative and an argument ensued. He slapped her twice and she picked up a kitchen knife and swung it at him. He took the knife from her, slapped her two or three times again and grasped her by the neck and hair. He stated his wife jerked away and the hair he was grasping pulled out in his hand. In the course of the argument, Newman claimed his wife admitted she had closed out the savings account to get money to pay interest on a $2,000 loan she had taken out at a local bank without his knowledge. After the argument his wife went to bed but she arose early the next morning to fix his breakfast.

He further testified that when he awoke the next morning, Saturday, November 20, 1971, his wife was talking on the telephone and hung up when he came into the kitchen. He discovered she had been talking to his aunt and he then telephoned the aunt and told her his side of the argument. He stated that he left the house at about 8:30 a.m. and told his wife he was going to find out about the bank loan and withdrawal. He stated she was crying when he left.

Mrs. Marge Arnold, a neighbor, testified that at 7:00 a.m., Saturday, November 20, she received a phone call from Mrs. Newman requesting her to come to the Newman home. Mrs. Arnold waited until the pickup truck Mr. Newman drove was gone from the house and then went over, arriving at about 8:45 a.m. When she arrived Mrs. Newman and Mrs. Niza Shaw, an elderly neighbor, were there. Mrs. Shaw testified she had also received a call from Mrs. Newman that morning between 7:30 and 8:00 requesting her to come to the Newman home.

Both Mrs. Arnold and Mrs. Shaw testified at trial as to Mrs. Newman's appearance, describing her face as red and swollen.

- 4 -

They also testified as to the conversation they had with Mrs. Newman. Mrs. Newman told them defendant had beaten her Friday night after supper and again Saturday morning, and that she was frightened and had to get out of the house. Mrs. Arnold testified that Mrs. Newman asked her to call her lawyer, Mr. Drysdale, and her doctor, Dr. Epler. Mrs. Arnold left to make the calls and being unable to reach either person, she returned to the Newman house at 10:30 a.m. and at the request of Mrs. Newman she called Gallatin county attorney, Thomas Olson.

County Attorney Olson testified he advised Mrs. Arnold to get Mrs. Newman out of the house and into the hospital. Another neighbor, Jessie Hubbert, took Mrs. Newman to the Bozeman Deaconess Hospital at about 11:30 a.m.

Nurses Barbara Asleson, Donna Bedient and Sue Lake testified as to Mrs. Newman's appearance, condition, and statements she made to them at the hospital. They also stated they smelled alcohol on Mrs. Newman's breath. At about 8:00, 9:30 and 11:30 p.m. that night, Saturday, November 20, Mrs. Newman had seizures. Nurse Bedient notified Dr. Craft of each seizure and after the seizure at 11:30 p.m. he came to the hospital. Dr. Craft notified Mr. Newman to come to the hospital and advised him that Mrs. Newman should be taken to Billings for an examination by Dr. Neal Meyer, a neurosurgeon. Mr. Newman agreed and talked to his wife at that time. Dr. Craft phoned Dr. Meyer and made arrangements for Mrs. Newman to be transported by ambulance to St. Vincent's Hospital in Billings.

At 5:30 a.m., Sunday, November 21, Robert Donin and another ambulance driver took Mrs. Newman in an ambulance and departed for Billings. At about 6:00 a.m., when the ambulance was near Livingston, Donin noticed that Mrs. Newman was having respiratory difficulties. He attempted to revive her and took her

- 5 -

directly to the Park County Hospital, where she was pronounced dead on arrival.

Dr. Volney Steele, the pathologist who performed an autopsy on Monday, November 22, determined the cause of death to be a subdural hemotoma or intercranial blood clot in the frontal left side of the cranial cavity. He stated the subdural hemotoma was caused by a subarachnoid clot which he estimated to be between 36 and 48 hours old at the time of autopsy. Dr. Steele stated he felt the origin of the subarachnoid clot was from trauma which could have occurred up to four days prior to the subdural bleeding, which he estimated to be under 24 hours old at the time of death. He stated that the cause of the intercranial bleeding was external trauma, such as a blow to the head or possibly an indirect trauma such as a fall to the buttocks. In addition to the intercranial blood clots he determined to be the cause of death, he also found various contusions of the face, neck and scalp, early cirrhosis of the liver, nodular goiter and a fluid condition in the lungs.

Dr. Charles Craft testified he had no medical opinion as to the cause of Mrs. Newman's death. The examining physician at the Park County Hospital did not testify.

Mr. Newman traveled to Billings the morning of Sunday, November 21, 1971, and first learned of his wife's death when he arrived at St. Vincent's Hospital.

Defendant presents eleven issues for review:

The trial court erred in:

(1) Admitting hearsay testimony of Mrs. Arnold and Mrs. Shaw concerning purported statements made to them by Mrs. Newman.

(2) Failing to grant defendant's motion to elect between voluntary and involuntary manslaughter, and as a result erred in admitting testimony of prior acts and incidents.

- 6 -

(3) Admitting into evidence pictures of the deceased.

(4) Refusing to admit into evidence a picture of the Newman porch.

(5) Submitting court's instruction number twelve to the jury on the subject of proximate cause and in refusing defendant's offered instruction number 3.

(6) Submitting court's instruction number 14, commenting on the subject of assault.

(7) Submitting Court's instruction number 16 on the subject of hastening death.

(8) Failing to submit the defendant's instruction number 16 on the subject of excusable homicide.

(9) Failing to direct a verdict for the defendant.

(10) Failing to submit the defendant's offered instruction number 13 on conjecture, suspicion or probabilities.

(11) Its sentence and judgment ordering defendant to serve seven years in the state prison.

Issue (1). We find merit in defendant's contention regarding the admissibility of certain statements purported to have been made by Mrs. Newman to Mrs. Arnold and Mrs. Shaw on Saturday, November 20, 1971. "Hearsay" is testimony or evidence of someone's words or conduct outside the court, when offered in court to prove the truth of the thing being asserted, and thus resting for its value upon the credibility of the out-of-court asserter.

We find no difficulty in determining that Mrs. Newman's out-of-court statements as repeated by her two friends are hearsay. But the difficult aspect of the "hearsay rule" of evidence, as it has developed from the common law and codified by statute, is not the rule itself, but rather the exceptions to the rule. The "dying declarations" exception as stated in section 93-401-27,

- 7 -

R.C.M. 1947, is not applicable in the instant case because a "sense of impending death" was never demonstrated. The catchall hearsay exception termed "res gestae" is the principle apparently relied upon by the trial court in ruling on the admissibility of these hearsay statements. In modern usage the "res gestae" exception actually involves four distinct types of cases: (1) excited utterances, (2) declarations of present sense impressions, (3) declarations as to state of mind, and (4) declarations as to body condition. In each of these instances the basic rationale underlying the "res gestae" exception to the hearsay rule is that the statements are spontaneous and contemporaneous, lending a particular reliability or trustworthiness to the statement.

The statements made by Mrs. Newman to Mrs. Arnold and Mrs. Shaw were not excited utterances, for they were made a period of twelve to thirteen hours after the alleged beating. Mrs. Newman's conduct during that period of time appears to have been relatively calm. The statements were not declarations of present sense impressions or present state of mind, but rather in reference to something that had happened the previous evening. Although the statements made by Mrs. Newman did concern her present and previous bodily condition, the requirement still exists that the res gestae statements must be spontaneous and substantially contemporaneous with the injury causing event (unless made to a doctor or medical person in the course of treatment).

Section 93-401-7, R.C.M. 1947, provides:

"Declarations which are a part of the transaction.
Where, also, the declaration, act, or omission
forms part of a transaction, which is itself
the fact in dispute, or evidence of that fact,
such declaration, act or omission is evidence,
as part of the transaction."

In In re Petition of Peterson, 155 Mont. 239, 242/467 P.2d 281, this Court stated:

"'"Res gestae are the circumstances, facts and
declarations which grow out of the main fact,
are contemporaneous with it, and serve to illus-
trate its character." State v. Broadwater,

- 8 -

75 Mont. 350, 243 P. 587, 589. <u>Declarations</u> <u>made while the mind of the speaker is labor-</u> <u>ing under the excitement aroused by the acci-</u> <u>dent, before there was time to reflect and</u> <u>fabricate, are admissible.</u>'" (Emphasis supplied.)

See also: Callahan v. Chicago, Etc. R. Co., 47 Mont. 401, 133 P. 687; Gunderson v. Brewster, 154 Mont. 405, 466 P.2d 589; Anno. 7 ALR2d 1324.

Here, we find the circumstances surrounding the making of the hearsay statements indicate that Mrs. Newman did have time to reflect, plan and, if it suited her purpose, fabricate. Therefore the res gestae rule does not apply and the testimony should properly have been excluded.

We cannot agree with the state's contention that the issue of prejudicial error on this point is made moot by the fact that Mr. Newman admitted slapping his wife five times on the Friday night in question. The hearsay statements report a more severe beating and an additional beating on Saturday morning and as such would be prejudicial.

Issue (2). Section 94-2507, R.C.M. 1947, provides:

"Manslaughter--voluntary and involuntary. Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

"1. Voluntary, upon a sudden quarrel or heat of passion.

"2. Involuntary, in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection."

"Malice" is the principal element differentiating murder from manslaughter. "Intent" is the principal element differentiating voluntary from involuntary manslaughter. State v. Souhrada, 122 Mont. 377, 204 P.2d 792; People v. McManis, 122 C.A.2d 891, 266 P.2d 134.

The record indicates the state introduced testimony, over objection, through its witness Mrs. Arnold that on two previous

occasions, once in June 1969, once in the summer of 1970, she saw Mr. Newman slap his wife; that she had observed bruises on Mrs. Newman in the months preceding her death.

Regarding the admissibility of this testimony, this exchange took place outside the presence of the jury;

> "THE COURT: Let me ask you: why are you introducing these? What probative purpose?
>
> "MR. OLSON: To indicate that the injuries and subsequent death, that the victim received as a result of the November 19, through November 21, happenings, is not the result of any accident, or anything like that, but is the result of an actual intended criminal act of the Defendant. And we introduce this as a similar type incident, which has probative value in having the Jury decide whether or not the Defendant is criminally responsible for this same similar incident happening in November of 1971."
> (Emphasis supplied.)

The second sentence of the prosecutor's statement, standing alone, would appear violative of a fundamental precept of Montana's criminal law; evidence of past, remote, independent and unrelated crimes is inadmissible to prove guilt of the crime for which defendant is presently being charged. State v. Merritt, 138 Mont. 546, 357 P.2d 683; State v. Gransberry, 140 Mont. 70, 367 P.2d 766. However, the entire statement, and particularly the reference to "an actual intended criminal act" indicates that the state introduced evidence of and undertook to prove intent and thus prove voluntary manslaughter.

The record indicates that at the end of defendant's case the trial court granted a defense motion requiring the state to elect between a charge of voluntary and involuntary manslaughter, and the state elected to specify the charge as involuntary manslaughter. This contradicted what was, in effect, an earlier election of the state, to prove the crime of voluntary manslaughter when it sought and was granted permission by the trial court to introduce evidence of intent. The net result of the change in the crime charged was that portion of Mrs. Arnold's testimony

which was admitted for the purpose of proving intent was now irrelevant, if otherwise admissible. In view of the fact that the record indicates no attempt by the state or the trial court to admonish the jury to disregard this testimony, we find defendant's second issue on appeal to be meritorious.

Issue (3). Was it error to admit into evidence four color photographs taken of Mrs. Newman's embalmed body by a Bozeman policeman?

Both the state and defendant cite State v. Bischert, 131 Mont. 152, 159, 308 P.2d 969, wherein this Court, quoting from its earlier decision in Fulton v. Chouteau County Farmers' Co., 98 Mont./37 P.2d 1025, stated:
48,

> "' * * * photographs stand on the same footing as diagrams, maps, plans and the like, and as a general rule, whenever relevant to describe a person, place or thing, they are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case.'
>
> "Photographs that are calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions. 20 Am.Jur., Evidence, section 729, page 609."

The four photographs were introduced by the state through its _first witness_, the Bozeman policeman who took the pictures. The only foundation information established in the police officer's brief testimony was that he had examined the photographs and that in his opinion they accurately depicted what was represented therein. Dr. Steele, the state's _last witness_, who testified two days later in the trial, made no reference to the photographs throughout the course of his testimony.

Defendant contends the rule of _Bischert_ is applicable because the state's photographs showed some flesh discolorations which were old and related to disease rather than trauma. The photographs did, however, show various bruises which were related

- 11 -

to trauma and the fact the photographs could tend to arouse sympathy in the minds of the jurors is not the only determinative issue. The probative value of these photographs was never explained to the jury by the medical witness.

Near the end of the trial it was discovered that one of the four photographs was inadvertently printed with the negative reversed. This photo was obviously inadmissible. As to the other three, we hold they were not properly admitted into evidence because there was no proper showing made by the state to establish the substantial necessity or instructive value of the photographs as a foundation for their admissibility.

Issue (4). Did the trial court err in refusing to admit into evidence a picture of the back porch of the Newman house, offered by the defense?

We find the trial court correctly refused to admit the picture, which was purportedly a portrayal of broken steps. There was nothing to establish the accuracy of the portrayal, nor to indicate that the picture would serve any instructive purpose beyond the testimony of Mr. Newman regarding the previous condition of the steps or the contention that his wife had fallen on the porch.

Of the six remaining issues for review, we find merit only in issues (5) and (7), concerning the court's given instructions No. 12 and No. 16.

Court's instruction No. 12, submitted by the state, reads in part:

> "You must also find beyond a reasonable doubt that the actions of the Defendant contributed to or was the proximate cause of the death of Elsie Newman, deceased." (Emphasis supplied.)

The emphasized words are an incorrect statement of the law. State v. Mally, 139 Mont. 599, 366 P.2d 868; State v. Bosch, 125 Mont. 566, 242 P.2d 477. We cannot agree with the state's

- 12 -

contention that the words "contributed to or was the proximate cause of" are "two statements of the same idea". The use of the word "or" in the quoted statement could be understood to mean that the actions of the defendant need not have proximately caused the death but only contributed to it.

Perhaps the rule of law the prosecution was attempting to state was that found in 40 C.J.S. Homicide §11(b):

> "The act of the accused must be a proximate cause of death but need not be the direct, immediate cause."

The words of instruction No. 12 do not fairly and accurately state that rule.

Court's instruction No. 16, submitted by the state, reads:

> "You are instructed that if you find from the evidence in this case that the deceased, Elsie Newman, was laboring under the effects of a poor physical condition, or had an alcoholic problem, to such a degree that in all probability these factors would have ultimately shortened her life, and if you further find that the Defendant inflicted a blow or blows upon the deceased which hastened or accelerated her death, that this is sufficient to constitute the crime of involuntary manslaughter as previously defined in these instructions."

Instruction No. 16 amounts to a comment on the evidence and is also defective for the same basic reason as instruction No. 12. California Jury Instructions - Criminal, 3rd Ed., §8.48, provides an example of an "unlawful injury accelerating death" type instruction which does not tend to mislead or confuse a jury as to the element of proximate cause.

For the reasons stated, the judgment is reversed and the cause remanded for new trial.

_____
Justice

We concur:

_____
Chief Justice

- 13 -

_(signature)_

_(signature)_

_(signature)_ Conway Harrison

Justices