THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.* JAMES W. BRUBAKER, DEFENDANT AND APPELLANT.

No. 14179.
Submitted Dec. 11, 1978.
Decided Oct. 29, 1979.
Rehearing Denied Dec. 5, 1979.
602 P.2d 974.

Michael J. Whalen, Billings, Paul M. Warren, argued, Billings, for defendant and appellant.

Mike Greely, Atty. Gen., Helena, Chris D. Tweeten, argued, Asst. Atty. Gen., Helena, Harold F. Hanser, County Atty., Billings, James D. Walen, argued, Deputy County Atty., Billings, for plaintiff and respondent.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

Appeal is by defendant James W. Brubaker from a judgment of conviction for aggravated assault entered against him in the Thirteenth Judicial District Court, Yellowstone County.

Sharon Watson (Brubaker) was brought to Big Horn County Memorial Hospital in Hardin at 7:30 p.m., January 12, 1977 in critical condition with multiple bruises over her body, arms, trunk, legs and marked swelling around her face and head and with abnormal neurological signs indicating severe head injury.

Defendant James W. Brubaker accompanied Sharon to the hospital. Dr. R. R. Whiting, Jr., took a history of the injuries from him, although not in detail "since it was not pertinent to the treatment of the patient". Brubaker told Dr. Whiting that he had found her lying face down in an area near or in their trailer house and that she was in a semi-conscious state at the time. Dr. Whiting did not ask what day or what time.

Dr. Whiting referred Sharon to Dr. Lashman W. Soriya, a neurological surgeon in Billings. She arrived at the emergency room in Billings at about 9:00 p.m. January 12, 1977. Dr. Soriya's diagnosis was that she had sustained a severe brain injury, resulting from a *contrecoup* injury. She was in a coma with no voluntary responses and with severe injury to parts of the brain that control function. After further diagnostic procedures that

evening and the next day, Dr. Soriya performed a right temporal craniotomy to relieve swelling on the right side of her brain that had resulted from a traumatic blow to her left temple area.

Dr. Soriya testified that the bruises he observed on Sharon's person would be consistent with bruises sustained by one who had been beaten by another person with hands and fists.

Sharon remained in the Billings hospital until March 2, 1977, when she was transferred to the Goettsche Rehabilitation Unit in Thermopolis, Wyoming. Sandra J. Runner, a speech therapist at Goettsche testified that she treated Sharon from April 1977 until August 1977 when Sharon was transferred back to Billings. Under instructions from the attending doctor there, Sandra J. Runner inquired frequently of Sharon as to what happened to cause her injury. Sharon's speech response was difficult, but in each case, Sharon's answer was "Don" apparently referring to her former husband Don Watson. However, the discharge records from Goettsche state that at no time during her stay did Sharon indicate who had attacked her.

The trial of the defendant occurred in November 1977. Shortly before the trial, Sharon was interrogated in a nursing home in Billings by Deputy Sheriff Rickard Ross. He submitted questions to her which he wrote down, and then he wrote down her responses. In those responses she indicated that Jim Brubaker had not struck her; that her former husband, Don Watson had struck her, although it was unclear what times she may have been talking about.

Sharon was also brought to the trial in a wheelchair to testify. From the record, it appears to have been an emotion-packed scene. On examination by the defense attorney she testified:

"Q. Do you know how you got hurt? A. Don hit.

"Q. Don hit? A. Yes.

"Q. Don who? A. Wat-son.

"Q. And is that how you got hurt now that you are being taken care of? A. Yes.

"Q. Do you know where you are staying now? A. No.

"Q. Are you in some sort of a hospital? A. Yes.

"Q. And do you know where that is? A. No.

"Q. Did Jim Brubaker— A. No.

"Q. Hurt you? A. No. Nurse.

"Q. What are you saying now? A. Nurse.

"Q. Who is nice? A. Jim.

"Q. Jim what? A. Nurse, nice, nice."

On cross-examination, her testimony was the same.

Defendant testified on his own behalf. Brubaker, then age 47, operated the Custer Bar in Custer, Montana, which bar was owned by his former wife. Sharon Watson had worked at the bar and for the past twenty months before the incident here involved they had lived together in a mobile trailer home attached to the Custer Bar. On the evening of January 11, Sharon was drinking. Past midnight, about 1:00 a.m. of January 12, the last customer left the bar and Brubaker proceeded to lock up. In closing up, he had to get some coal for heat and went across the street to procure the coal. He made two trips with two buckets of coal. Getting the coal, banking the fire, adjusting the thermostat and other actions in closing the bar took approximately one-half hour. On his first return to the bar while he was getting coal, he did not see Sharon. On his second return, when he was about to turn off the lights, he called for her and got no response. He found her lying on the floor in the areaway or hall leading to their home. He estimated it was close to 1:00 a.m. of January 12. He observed her bruises, but had no idea how she had been injured. He picked her up and brought her to her bedroom in the mobile home. She told him that her head hurt and asked for aspirin. He got her some Anacin and 7-Up which she drank. She went back to sleep. In the early morning she awakened and asked for more aspirin and 7-Up, which he again procured. That would be approximately 5:00 o'clock a.m. or thereafter. During that day, he was helping with construction around the place, taking care of the business of the bar, and going to see her from time to time. He thought she was sleeping comfortably. He did not feel an immediate need for medical attention for her. About 6:00

p.m. that afternoon, he decided to call the ambulance from Hardin, wherein Sharon was brought to the Big Horn Memorial Hospital as we have indicated.

Both doctors testified that based upon the changes in coloration and swelling of the bruises, the injuries had occurred to Sharon at least 48 hours before she was brought to the Big Horn Memorial Hospital.

The foregoing constitutes essentially the direct evidence of the crime charged that was brought forward in the case. We will discuss the indirect evidence which was introduced as we discuss the issues hereunder.

These are defendant's issues on appeal:

1. That the District Court erred in allowing the State to play before the jury a tape-recorded statement taken from defendant on January 17, 1977.

2. That the District Court erred in admitting evidence of statements made by Sharon Watson Brubaker to Dr. E. V. Jones and to Mary Duschell.

3. That the District Court erred in admitting evidence of prior assaults of defendant upon Sharon through the testimony of witnesses Perrin, Gilreath and Eldon Brubaker.

4. That the District Court erred in allowing Deputy Ross to give hearsay testimony and in denying defendant's offered testimony that Sharon acknowledged that she knew Jim Brubaker in her injured condition.

Taking these issues in order, the record relating to the tape recording is this:

On January 17, 1977, Deputy Sheriff Ross with two other officers went to the Custer Bar and there proceeded to take a tape-recorded statement from the defendant James Brubaker. The tape recording reveals that the officer gave Brubaker the *Miranda* warnings and that Brubaker consented to the recording of his interview. However Brubaker said, when his rights were read to him, that he felt "the seriousness of this case and it would probably be

advisable for me to obtain an attorney." He then went on to say however, that he didn't feel he needed an attorney at that time and that he would go ahead with the statement. In the interview, Brubaker then described the incident of finding his wife in much the manner that he testified at trial as we have set out previously.

Following his interrogation about the incident itself, however, Deputy Ross then asked Brubaker whether he had previously struck Sharon. He denied striking her, then related how she had at one time struck him on the chest with a skillet in which she was frying meat and then he made this statement:

"Q. . . . During the time that you have been living with her, have you ever struck her? A. Yes, I have. I popped her on the face one time.

"Q. Open fisted or . . . A. Open hand, just a [sic] open hand swat.

"Q. When was that? A. Oh, that's been quite a while ago. We got in kinda a little argument over this guy that she used to be married to. . . ."

At the conclusion of the taped interview, defendant in response to questions stated he had no fights with Sharon on the night when he found her injured, nor did he strike her in any manner.

The motion to admit the tape-recorded statement of the defendant follows the testimony of the first witness, Dr. Soriya. In argument in chambers concerning the motion, defendant objected upon the grounds that the tape-recorded statement was not a confession, that the defendant was available to testify and would testify, that the taped interview contained references to other possible crimes or collateral matters and that since the defendant thought he should have had an attorney, he should at that point have been provided with an attorney and any further interrogation should have stopped.

The court admitted the tape-recorded statement into evidence (having deleted some objectionable parts) upon the ground that his statement was an admission against interest.

With respect to whether defendant should have been pro-

vided with an attorney when defendant said it was probably advisable, the tape recorded interview shows that nevertheless he went ahead and fully consented to being interrogated. Thus the statement is voluntary, he having been advised of his rights. He cannot now complain of the admission of the statement into evidence on the grounds that he was without counsel at the time. A statement made voluntarily after the speaker has been made fully aware of and understands his rights is not objectionable because the statement is made without the advice or assistance of counsel. See *State v. Ryan* (1979), 182 Mont. 130, 595 P.2d 1146; *State v. Lucero* (1968), 151 Mont. 531, 445 P.2d 731.

One should not be confused about the admissibility of evidence simply because it is electronically recorded or preserved. Such evidence is subject to the same tests for admissibility as the direct evidence of eye witnesses or the testimony of listeners to oral statements. Once, as here, it is established that a prospective defendant, duly advised of his rights, voluntarily consents to the tape recording of his statements, the constitutional defenses of self-incrimination, unlawful search, invasion of privacy, and right to counsel disappear.

Then the tape-recorded statement may be regarded as independent direct evidence or as corroborative evidence. In either case, the tests for admissibility are the same. *Cape v. United States* (9th Cir. 1960), 283 F.2d 430. In this case, the taped interview contained no admission of the defendant as to his complicity in the alleged crime. It was not self-incriminatory. As to the alleged crime, it was merely direct evidence of statements made by the defendant as to his knowledge of the circumstances. Since the interviewing detective could have testified directly to such statements (assuming the same constitutional waivers), the recorded statements are themselves admissible. In fact, the tape is a more reliable record than the oral testimony of the interviewer given the frailty of human recollection. We note here that a proper foundation for the admission of the tape was laid by the prosecution. Again, the question of admissibility of this type of evidence is left to the sound

discretion of the trial judge. 29 Am.Jur.2d 495 *Evidence* § 436. No question is presented here as to the integrity of the recording, that is, regarding its recording quality or audibility.

We find no error therefore in the admission by the District Court of the tape-recorded statement of defendant. However, that portion of the tape recording relating to the "popping" incident requires separate discussion and we will consider it in connection with the third issue.

The second issue raised by defendant is that the District Court erred in admitting evidence of statements made by Sharon Watson (Brubaker) to Dr. E. V. Jones and Mary Duschell, on the ground that such statements were hearsay.

Dr. E. V. Jones, an oral surgeon, had treated Sharon on May 10, 1975 for a broken jaw. His written charts relating to her treatment contain no reference to any alleged statements by her that James Brubaker had assaulted her at that time. Dr. Jones saw her again on June 21, 1976 and on that date, he observed considerable swelling at the location of the fractured jaw and discoloration of her face, arms and legs. He testified that there was only slight injury to her mouth. Upon inquiry by him as to what happened to her, Dr. Jones testified that she answered she had been beaten by defendant Brubaker.

Brubaker claims that the evidence of Dr. Jones relates to an alleged prior crime, is purely hearsay and as such is inadmissible.

The District Court admitted that Dr. Jones' testimony regarding statements made by Sharon, because Dr. Jones received them for the purpose of medical diagnosis or treatment under Rule 803(4), Mont.R.Evid. Otherwise, as the District Court admitted, such evidence would be purely hearsay. The defendant claims that such statements to be admissible should be reasonably pertinent to the diagnosis of or treatment by the doctor.

". . . . when statements as to causation enter the realm of fixing fault it is unlikely that the patient or the physician regarded them as related to diagnosis or treatment." McCormick, *Evidence* § 292 (2d ed. 1972), p. 691.

The record presents us with a substantial difficulty regarding Dr. Jones' testimony. Before admitting the testimony before the jury, the District Court held an in-chambers hearing ahead of time, to determine whether or not it would admit such evidence. The in-chambers hearing went into considerably more detail regarding Sharon's statements. For example, there Dr. Jones testified that Sharon had told him on June 21, 1976 not only that Brubaker had struck her to cause the swelling and discoloration which he noticed on the 21st, but that "it was the same guy here that did it the first time", meaning apparently the original broken jaw of May 10, 1976.

When Dr. Jones was brought out before the jury however, his testimony as to having received Sharon's statement for the purposes of medical diagnosis or treatment is only this:

"Q. Did you inquire as to what happened to her? A. Yes, I asked the statement, what had happened to her.

"Q. Now was it important for you to know in determination as to what to do next and how to treat her? A. Only insofar as pertaining to my field.

"A. And that is to the mouth? A. To the mouth and jaws.

"Q. And there was injury to the mouth? A. Slight."

In his testimony before the jury, Dr. Jones was not asked anything further with respect to how he used the information for medical diagnosis or treatment of Sharon. When he was giving his in-chambers testimony, he had testified that it was necessary to take an x-ray of her jaw to determine whether it was further injured. As to the testimony before the jury, however, the evidence should not have been received because no proper foundation was laid for Sharon's statement, nor was it shown that he received a statement for the purpose of medical diagnosis and/or treatment to come within the exception under Rule 803(4), Mont.R.Evid.

Turning now to the testimony of Mary Duschell, the record shows that she testified she was a neighbor to the Brubakers in Custer; that she operated a nearby bar; that in June 1976 at approximately 11:00 one night Sharon had come pounding on her

door to be let in. Mary Duschell testified that Sharon looked a mess and "had her jaw out as big as a football", and that Sharon said Jim had beaten her. Mary Duschell also testified to a subsequent occasion in midsummer 1976 at a time she was unable to fix when again Sharon had come to her bar and when Mary Duschell had let her in, Sharon told her that "Jim was after her."

Defendant objects to the evidence of Mary Duschell on the ground that it relates to an alleged prior crime and is purely hearsay.

The State claims that the evidence is admissible under Rule 404(b), Mont.R.Evid., that evidence of other crimes, wrongs or acts are admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Direct evidence of other crimes, if such evidence came within the above exceptions, would be admissible under Rule 404(b) Mont.R.Evid. Here the evidence is indirect, by means of hearsay, and must also conform to the rules relating to the admission of hearsay testimony.

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Rule 801(c) Mont.R.Evid. In this case, the matter asserted is that Jim Brubaker assaulted Sharon on or about January 11, 1977. It may be considered that the evidence of Mary Duschell is offered to prove motive, opportunity, intent, plan and identity of Brubaker, and thus proves the matter asserted by the State. Mary Duschell's testimony of what she said to Sharon outside the presence of Brubaker is hearsay. Sharon's statements to Mary Duschell in response are hearsay within hearsay. Hearsay, and hearsay within hearsay, are not admissible unless they come within the exceptions provided in the Rules. Rule 802, 805, Mont.R.Evid.

If we regard Sharon as an unavailable witness because of her physical condition at the time of the trial, her statements as a declarant would be admissible if they came within the exceptions

set out in Rule 804, Mont.R.Evid. However, her statements do not fit within any of those exceptions. Particularly, we do not find that her statements are covered by exception (5) to Rule 804, Mont.R.Evid., as having comparable circumstantial guarantees of trustworthiness, because in this case the testimony of her statements comes from Mary Duschell, who admittedly does not like Brubaker. Nor can we regard Sharon's statements "as excited utterances" because such utterances are admissible only if they are part of the *res gestae* of the crime charged. *State v. Newman* (1973), 162 Mont. 450, 457, 513 P.2d 258, 262. Moreover, Mary Duschell's testimony that on the second occasion Sharon said, "Jim was after me" is not admissible either as evidence of a prior crime or wrong or as an exception to the hearsay rule.

We hold therefore, that the admission of the statements of Sharon to Mary Duschell and Dr. Jones constituted prejudicial error to the defendant in this case.

The third issue relates to the claimed error in admitting evidence of prior assaults through the testimony of witnesses Perrin, Gilreath and Eldon Brubaker. Defendant contends that such testimony was evidence of "wholly independent" crimes and therefore inadmissible.

The testimony of Perrin and Gilreath apparently relate to a single incident that occurred at the Prairie Diner some two miles east of Custer. On a night in June 1976 (both witnesses had given earlier taped statements of different dates to Deputy Ross, but amended the dates near the time of trial after consultation with the county attorney), they were in the bar of the Prairie Diner and were looking out the window when they observed defendant Brubaker strike Sharon on her face. They testified that she became unconscious and that he lifted her into the car.

Eldon Brubaker, the 15 year old son of the defendant, had lived with his father and Sharon in the school year ending May or June, 1976, after which he left the family home. In testifying, he recounted an occasion before he left when he saw his father strike Sharon with his fist.

In *State v. Jackson* (1979), 180 Mont. 195, 589 P.2d 1009, 1014, we had occasion to discuss evidence of independent crimes apart from the crimes alleged:

"We recognize the general rule that when a defendant is put on trial for one offense, he should be convicted, if at all, by evidence which shows that he is guilty of that offense alone. Evidence which in any manner shows, or tends to show, he has committed another crime *wholly independent*, even though it is a crime of the same sort, is irrelevant and inadmissible . . . *State v. Frates* (1972), 160 Mont. 431, 436, 503 P.2d 47. The reason for this rule is obvious: a defendant is entitled to be informed of the 'crime charged, in order to prepare his defense, proof of other crimes subject him to surprise and defense of multiple collateral or unrelated issues. *State v. Nicks* (1958), 134 Mont. 341, 332 P.2d 904."

The foregoing is the general rule on the admissibility of evidence of other crimes. In *State v. Merritt*, we set out the exception to the general rule:

'As a general rule, evidence of other crimes than that charged is competent when it tends to establish a common scheme, plan, system, design, or course of conduct, at least where such other crimes are similar to, and closely connected with, the one charged, and were committed at about the same time or at a time not too remote. Another statement is that evidence of other crimes is admissible to prove the crime charged when it tends to establish a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other or others.' " *State v. Merritt* (1960), 138 Mont. 546, 549, 357 P.2d 683, 684.

It appears that these earlier statements of this Court have now been incorporated in Rule 404(b), Mont.R.Evid.

Accepting the premise that the admission of proof of wholly independent crimes is an exception to the general rule, we are obligated to look very carefully at the relative probative value of such evidence and weigh it against the prejudice inherent in this type of evidence. *State v. Frates*, supra, 160 Mont. 431, 437, 503 P.2d 47, 50.

■ For evidence of unrelated crimes to be admissible, as an exception to the general rule, it must appear that the evidence of the other crimes tends to establish a common scheme, plan, system, design or course of conduct similar to or closely connected with the one charged and not too remote; and the evidence must tend to establish crimes so related that proof of one tends to establish the other. Within those words must be found the paste and cover for the admissibility of the unrelated acts here. We are mindful that the victim has continuously indicated that it was her ex-husband, Don Watson, and not the defendant, James Brubaker, who caused her injuries.

■ The evidence of Perrin and Gilreath relates to an incident where the assault by Brubaker resulted in a severe injury to Sharon and it was an attack within the kind that must have occurred to her on January 10, or 11, 1976. Therefore, it was a course of conduct similar to the crime charged and tends to prove the crime charged. The evidence of Eldon Brubaker was also admissible, but only if further foundation is laid, establishing more exactly the time of the assault and that as a result of the punches which he observed, Sharon received some severe injuries.

In our recent decision of *State v. Just* (1979), 262 Mont. 184, 602 P.2d 957, Judge W. W. Lessley writing for the Court, set out certain procedures to be followed by the State when it proposes to introduce evidence of other crimes. Those procedures must be followed here in any retrial, and will have the salutary effect of removing much of the sting of prejudice which hangs over the first trial of this cause.

■ The District Court was faced with some very difficult decisions in handling the trial in this case. The State's case against the defendant was circumstantial. There were many reasons for a jury to distrust the defendant's statement of the incident. Since he did not get her to a hospital for nearly twenty hours, he is the only person known from the evidence to have had opportunity to commit the assault, and the medical evidence as to the age of the bruises indicates that Sharon may have been injured for a much longer

period of time than defendant's testimony indicated. The evidence of the prior assaults may have led the District Court to surmise that defendant was probaby guilty of the offense charged. Therein lies the trouble, the necessity to resort to surmise and probability. Such evidence of unrelated acts should not be admitted unless the proof thereof tends toward the conclusion that the defendant is guilty of the crime charged with moral certainty and beyond a reasonable doubt.

Because of the difficulty the court faced in this cause, it drafted and submitted to the jury its instruction no. 10. The effect of that instruction was to tell the jury that the previous assaults were not to be considered by the jury for the purpose of proving the character of Brubaker, but that such evidence could only be considered as to the defendant's possible motives, opportunities, intent, preparation, plan, knowledge, identity, absence, or accident in relation to the crime charged.

In submitting the instruction, the court stated to counsel it had admitted the evidence of other assaults for the reason that part of the defense offered by the defendant was that at least one other person had a record of beating Sharon (her former husband, Don Watson) and that it would be unfair to the State to allow this type of defense without also allowing the State to prove that the husband also had a prior record of assaulting her. The instruction, however, limited the jury only as to a consideration of the defendant's character, and did not limit the jury in considering whether proof of the prior assaults would tend to establish that the defendant had committed the assault on January 12, 1976.

■■■ We find no difficulty with the court's instruction no. 10 as submitted, provided that on retrial of this case, the jury should be instructed that such prior assaults are circumstantial evidence of the defendant's guilt with respect to the crime charged and the usual cautionary instructions given with respect to the application and consideration by a jury of circumstantial evidence.

In connection with the alleged prior assaults of Jim Brubaker upon Sharon, it should be noted that a good deal of time of the trial

was taken up in proving the alleged prior assaults. It is difficult to note from the record exactly how many prior assaults are being ascribed or charged to Brubaker. The evidence is most confusing. One could conclude that the evidence shows at least five prior assaults, or it might be concluded that Dr. Jones, Mary Duschell, and the witnesses Perrin and Gilreath, are all describing one assault which resulted in a broken jaw. When evidence of other crimes or wrongs is admitted to prove the truth of the crime charged, such evidence should be clear and direct and not leave the jury to speculate as to the number of times the other alleged assaults may have occurred. This is a matter of proper foundation, and on retrial, the District Court should require the State to prove with reasonable particularity and certainty the number of other assaults being testified to, provided that such other assaults are within the general rules for admission of such evidence.

The fourth and final issue rasied by defendant Brubaker is that the District Court erred in allowing Deputy Sheriff Ross to give hearsay testimony respecting his interview with Sharon, in relation to an interview which occurred shortly before the trial, and in denying defendant's offered testimony that Sharon acknowledged on another occasion in her injured condition that she knew Jim Brubaker.

The evidence respecting Deputy Sheriff Ross's interview of Sharon does not come within any of the exceptions of Rule 804, Mont.R.Evid., and should have been excluded for the same reason that the defendant's offered testimony of the recognition of Brubaker by Sharon is likewise inadmissible.

Accordingly, the cause is reversed and remanded to the District Court for further proceedings consistent with this Opinion.

MR. JUSTICE DALY concurs.

MR. CHIEF JUSTICE HASWELL dissenting.

I would affirm the conviction.

The principal battleground at trial and upon appeal is the admissibility of evidence of prior beatings of the victim by the defend-

ant. Dr. Jones, Mary Duschell, Eldon Brubaker, Kenneth Perrin and Donald Gilreath testified to a total of five such beatings in roughly the first six months of 1976.

Dr. Jones, an oral surgeon, treated the victim for a broken jaw during May, June and July 1976. He first saw the victim on May 10, 1976, at which time she had a comminuted fracture of the jaw and an impacted tooth. Dr. Jones treated her on several visits thereafter. When the victim appeared in his office on June 21 she had been injured a second time and was black and blue on her face, arms and legs. At that time the victim told Dr. Jones that defendant "had beaten up on her" and that "it was the same guy that did it the first time."

At the hearing in chambers outside the presence of the jury to determine the admissibility of Dr. Jones' testimony, he testified that the information given him by the victim concerning the injuries around her mouth were important and helpful in treating her. The trial judge ruled the testimony was admissible.

In my opinion, Dr. Jones' testimony was admissible under Rule 803(4), Mont.R.Evid.

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

". . .

"(4) Statements for purposes of medical diagnosis or treatment. *Statements made for purposes of medical diagnosis or treatment . . .* or past or present symptoms, pain or sensations, *or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.*" (Emphasis added.)

The majority hold the testimony inadmissible because the doctor did not repeat in the presence of the jury that the statements of the victim were important and helpful in treating her injuries. The admissibility of evidence is to be determined by the judge alone and the jury plays no part in determining questions of admissibility of evidence. The judge had already ruled the evidence admissible at the hearing in chambers. A repetition of the foundation testimony

before the jury, while preferable, was not essential to any function of the jury at trial.

In my view the testimony of Mary Duschell, Eldon Brubaker, Kenneth Perrin and Donald Gilreath concerning prior beatings of the victim by the defendant was also admissible.

Rule 404(b) of the Montana Rules of Evidence states:

"Other crimes, wrongs, acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*" (Emphasis added.)

In this case the defendant's motive and identity were squarely in issue. The prior beatings constitute evidence of continuing marital discord and a motive for the aggravated assault of which the defendant was charged. These prior beatings also were evidence of a prior continuing course of conduct by the defendant toward the victim constituting a common scheme, plan or design.

Where evidence of other crimes is similar to, closely connected with, and not too remote from the one charged, and where they are so related that proof of one tends to establish the other, the evidence is admissible. *State v. Jensen* (1969), 153 Mont. 233, 455 P.2d 63 and cases cited therein. Although distinguishable on the facts, a child beating case decided by us indicates application of this principle and holds this kind of evidence admissible. *State v. Taylor* (1973), 163 Mont. 106, 515 P.2d 695.

As stated by the majority, the probative value of this evidence must be weighed against its prejudicial effect in determining its admissibility. It is the only proof of motive, viz. marital discord. It is a continuous course of conduct by the defendant toward the victim over a substantial period of time, contradicts the testimony of some of defendant's witnesses, and involves the same kind of crime, viz. beatings around the head and face with the fists. When so weighed, I cannot say that the trial judge abused his discretion in admitting this testimony.

No hearsay objection was made to the testimony of Deputy Sheriff Ross. Rule 103(a) requires a specific objection on this ground to preserve the issue on appeal. The plain error rule eliminating the need for such objection is inapplicable because such claimed error does not affect a substantial right of the defendant. Rule 103(d), Mont.R.Evid. Here the victim at the trial identified the defendant and testified she knew him.

Accordingly, I would affirm the conviction.

MR. JUSTICE HARRISON concurring.

MR. JUSTICE SHEA concurring:

I agree that defendant's conviction should be reversed, but I do not agree with all that is said concerning the admissibility of similar offenses. I shall confine my remarks however, to the reasons for admitting the evidence and the instructions given to explain the limited purpose for which the jury could consider the evidence.

Assuming the admissibility of the evidence of other assaults committed upon the wife by her husband, the reasons for admission of the evidence were not for all the reasons stated in Rule 404(b), Mont.R.Evid. I cannot conceive that the evidence in this case against the defendant was admitted for the purpose of showing the defendant's "possible motives, opportunities, intent, preparation, plan, knowledge, identity, absence of accident in relation to the crime charged." The rule itself lists the foregoing as the possible exceptions under which such testimony can be admitted, but certainly those reasons do not exist in each case.

For example, in this case, the evidence could have been admitted to show defendant's motives (that is, a longstanding and bitter relationship with his wife which frequently led to physical assaults). But the remaining factors in Rule 404 were not applicable to this case. Therefore, the prosecution should have been more careful in selecting the grounds and marshalling the reasons for the admissibility of the evidence, and the trial court should have been more careful in instructing the jury. Clearly, under the facts of this case, the jury was not entitled to consider all of the exceptions listed

in Rule 404(b) as being reasons why the evidence was admitted. If, after assessing the need for such evidence, and applying the proper balancing test as to whether or not to admit such evidence, the trial court does admit such evidence, it is its duty to carefully instruct the jury as to the precise reason why it was admitted, and to caution the jury that it can be considered for no other reason.

I am also concerned in this case about the sloppy method by which the prosecutor sought admission of the alleged previous assaults. Absolutely no effort was made to tie each assault to a time and place, and therefore permit the defendant to meaningfully defend against these accusations. Moreover, the evidence as admitted, could have been extremely confusing to the jury. Because of the varying testimony as to the alleged previous assaults the jury could well have erroneously concluded that the defendant had assaulted his wife on more occasions than was actually the case. If the prosecution cannot tie these events into a time and place so as to become a definite event, the evidence being so inherently prejudicial in the first place, despite the need for it in this case, should not be admitted.