No. 05-125

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 101

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

ANGELO DEAN MAESTAS,

        Defendant and Appellant.

APPEAL FROM:     The District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC 03-109,
Honorable John W. Whelan, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Don Vernay, Attorney at Law, Rio Rancho, New Mexico
                Francis P. McGee, Attorney at Law, Butte, Montana

        For Respondent:

                Hon. Mike McGrath, Montana Attorney General, Tammy K Plubell,
                Assistant Attorney General, Helena, Montana

                Robert M. McCarthy, Butte-Silver Bow County Attorney, Brad Newman,
                Deputy County Attorney, Butte, Montana

Submitted on Briefs:  November 9, 2005

Decided:  May 9, 2006

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Angelo Dean Maestas entered a guilty plea to deliberate homicide by accountability in which he reserved the right to appeal the District Court's denial of his motion to suppress incriminating statements he made to investigating detectives. He alleges that the detectives violated his right to counsel.  We affirm.

## ISSUE

¶2     The issue on appeal is whether the District Court erred in denying Maestas' Motion to Suppress.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On May 30, 2003, Angelo Dean Maestas (Maestas) was charged with deliberate homicide, or in the alternative, deliberate homicide by accountability.  The District Court scheduled a jury trial which was repeatedly rescheduled at Maestas' request.  In July 2004, while the trial was pending, Maestas filed a motion to suppress incriminating statements he had made to detectives while he was initially interviewed as a suspect.  Maestas claimed one of the detectives violated his constitutional right to an attorney.  The State argued that Maestas' request for counsel was not clear and unequivocal, and Maestas' admissions had been made voluntarily.  In September 2004, the District Court conducted a hearing and denied Maestas' motion.  On October 4, 2004, Maestas entered a guilty plea to deliberate homicide by accountability, reserving his right to appeal the court's denial of his motion to suppress.  On December 2, 2004, the District Court sentenced Maestas to thirty (30) years at Montana State Prison.  On January 24, 2005, Maestas filed a Notice of Appeal of the court's

2

order denying his motion to suppress. Additional facts will be discussed as necessary to our analysis.

## STANDARD OF REVIEW

¶4 We review a district court's denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether the district court's interpretation and application of the law is correct. *State v. Clifford*, 2005 MT 219, ¶ 25, 328 Mont. 300, ¶ 25, 121 P.3d 489, ¶ 25.

## DISCUSSION

¶5 On March 4, 2003, the Butte-Silver Bow Law Enforcement received a report of a homicide. Shortly after the officers began their investigation, they received a tip that Maestas had assisted another man in "cleaning up" the crime scene. On the afternoon of March 4, the officers took Maestas into custody for questioning. Detective McCarthy conducted four short interviews with Maestas between 2:45 p.m. and approximately 8:20 p.m. on March 4. These interviews, as well as subsequent ones, were audiotaped. At the beginning of the first interview, McCarthy advised Maestas, both orally and in writing, of his constitutional rights. Maestas informed the detective that he already knew his rights but signed and initialed each right as it was read and carefully explained to him.

¶6 McCarthy's first interview with Maestas lasted approximately forty-five minutes during which Maestas denied any knowledge or responsibility of the crime. Maestas told McCarthy that he had spent the evening in question at a local bar throwing darts and shooting pool. McCarthy temporarily suspended the interview and left the room to try to corroborate

3

Maestas' account of the evening. When he returned, McCarthy informed Maestas that Jimmy, the bartender at the bar, had reported that Maestas and several others, two of whom were Maestas' co-defendants in this case, had left the bar together at a specific time. Maestas became angry and denied having left the bar with these people. As McCarthy pressed him about the difference between Maestas' story and the bartender's, the following colloquy occurred:

Maestas: You know what, I'm not gonna sit here—charge me—let me get a fucking bondsman or whatever. I ain't done nothing. Now, give me a fucking lawyer 'cause I don't have to sit here and fucking put up with this bullshit, 'cause I ain't done nothin'. You can ask Jim, the owner, what time we left.

McCarthy: Wait a minute. Wait a minute.

Maestas: 'Cause I ain't done nothing.

McCarthy: Do you want a lawyer?

Maestas: I don't need a lawyer. I ain't done nothin'. I don't need a lawyer.

McCarthy: You just got through saying you wanted a lawyer.

Maestas: Well, no, but I'm just getting tired of this shit.

McCarthy: Do you want a lawyer?

Maestas: I ain't done nothing' is what I'm trying to tell you. I ain't done nothin'.

McCarthy: Wait a sec.

Maestas: And I know where I was at and I know where I've been.

McCarthy: Do you want a lawyer?

Maestas: No, I don't need a lawyer. For what reason? I ain't done nothin'.

McCarthy: You . . .

4

Maestas:     I know I just said that I needed a lawyer, but for what? I don't need a lawyer.

McCarthy:    Okay. Well, I want to make sure I don't violate your rights. If you want a lawyer, this interview stops right now and you get a lawyer.

Maestas:     But I . . . but  I . . .

McCarthy:    If you want to keep talking to me then . . . we'll keep talking.

Maestas:     I'll keep talk—I ain't done nothin' is what I'm trying to tell you.

McCarthy:    Okay. But let's . . . but let's get this taken care of. I don't want to violate your rights. Do you want to keep talking?

Maestas:     I'll keep talking to you. I ain't done nothin' wrong. Why in the hell . . .

McCarthy:    You don't feel you need an attorney at this point?

Maestas:     Not at this point. But can I ask you – let me ask you a question.

McCarthy:    Sure.

Maestas:     Why am I being questioned here for this long?

¶7     Maestas was interviewed twice more on March 4. McCarthy testified that between interviews, he conducted other interviews attempting to corroborate what Maestas had told him. McCarthy also testified that in every interview after the first one, he reminded Maestas of his rights and told Maestas that he could stop the interview at any time.

¶8     During his last interview on March 4, Maestas told the officers that one of his co-defendants had killed the victim. Maestas denied being present at the time the homicide occurred. At the end of the last interview on March 4, when asked, Maestas stated that the officers had treated him "fine" and acknowledged that he had given his statements of his own free will.

¶9     After the last interview on March 4, the County Attorney's Office directed the officers to hold Maestas on a 48-hour investigative hold and transport him to the temporary detention facility at Warm Springs. He was returned to McCarthy's office on March 5 for additional interviews. As the first March 5 interview began, McCarthy again explained Maestas' rights to him and Maestas signed and initialed another notification form and waived those rights. McCarthy testified that in one of the later interviews on March 5, Maestas admitted that he had been at the victim's home when the victim was beaten. Maestas also volunteered to assist them in the investigation.

¶10     Maestas was again interviewed by Butte-Silver Bow officers on March 6. Before the first interview of the day, Maestas again signed a notification and waiver of rights form. He was released from custody on March 6. Subsequently, on May 30, he was charged with deliberate homicide, or in the alternative, deliberate homicide by accountability.

¶11     At the suppression hearing, Maestas admitted that he continued talking after requesting counsel in the March 4 interview. He stated, however, that even though he kept talking and repeatedly insisting that he did not want an attorney, he really did want one and he really did not wish to continue talking. He also admitted, however, that he voluntarily

engaged in all subsequent interviews. On redirect examination, he recanted this statement and said that McCarthy reinitiated conversation after he had asked for counsel.

¶12 The District Court, after reviewing the audiotape of Maestas' interview and listening to Maestas' testimony, concluded that the statement made by Maestas in which he requested a bondsman, a lawyer, and corroboration of his story by the bar owner was, "in the context and in the manner made, . . . not sufficiently clear to Detective McCarthy. Thus it was permissible for Detective McCarthy to interrupt [Maestas] to clarify his request." The court noted that McCarthy made no attempt to persuade Maestas to continue speaking. Additionally, the District Court observed that after the alleged invocation of rights, Maestas said nothing self-incriminating until the next day, following his second acknowledgment and waiver of his right to counsel. As indicated above, Maestas testified that he participated in all interviews conducted on March 5 and 6 voluntarily.

¶13 Relying on *State v. Spang*, 2002 MT 120, 310 Mont. 52, 48 P.3d 727, overruled in part by *State v. Buck*, 2006 MT 81, ___ Mont. ___, ___ P.3d ___, Maestas argues on appeal that his request for an attorney during his second interview on March 4, was a "clear and emphatic invocation of his right to counsel," and that McCarthy should have terminated the interrogation immediately without asking any follow-up questions. In *Spang*, Spang was questioned about a double homicide. After being notified of his right to counsel and waiving that right, he voluntarily spoke with investigating officers and provided incriminating information. Subsequently, the officers conducted a second custodial interrogation of Spang. Again, Spang was advised of his rights, at which time, he stated that he needed a lawyer.

Rather than stop the interview, however, the officer asked Spang whether he wanted to talk to the police before talking to an attorney. The officer also asked Spang if they could talk about the information Spang had provided during his first interview. Spang agreed and ultimately provided similar incriminating evidence as provided in the earlier interview. The State argued that Spang's request for counsel was equivocal, thus allowing the officer to ask limited questions to clarify whether Spang wanted an attorney or wanted to continue with the interview. The district court denied Spang's motion to suppress. We reversed, holding that:

> If suspects effectively waive their right to counsel after receiving *Miranda* warnings, law enforcement officers are free to question the suspects. However, if suspects request counsel at any time during the interview, they are not subject to further questioning until a lawyer has been made available or until the suspect reinitiates conversation with law enforcement officers.

*Spang*, ¶¶ 20-21 (internal citations omitted).

¶14 Applying *Spang*, Maestas maintains that because his request for counsel was unequivocal, McCarthy should not have asked him *any* further questions, including questions designed to clarify whether Maestas was actually requesting counsel. He contends that because McCarthy asked him such follow-up questions rather than terminating the interview until counsel was obtained, his rights were violated and the District Court should have granted his motion to suppress.

¶15 The State counters that Maestas' request was ambiguous and equivocal—he told the officer to arrest him; get him a bail bondsman; get him an attorney—and then immediately claimed he did not need an attorney. Therefore, the State maintains, also relying on *Spang*, that it was "good police practice" for McCarthy to ask clarifying questions, while not

attempting to persuade Maestas to continue the interview.  In *Spang*, citing *Davis v. United States* (1994), 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362, we stated:

> If a suspect makes a reference to an attorney that is ambiguous or equivocal, the cessation of questioning is not required.  Hence, questioning may continue if a suspect does not actually request to speak to an attorney.  See *Davis*, 512 U.S. at 462, 114 S.Ct. at 2357 . . . .  The Court in *Davis* noted that when a suspect makes an ambiguous or equivocal statement, it will often be "good police practice" for interviewing officers to clarify whether or not the suspect wants an attorney.

*Spang*, ¶ 21.

¶16     The State also contends that even if Maestas did make an unequivocal request for counsel, he reinitiated contact with investigators as did the defendant in *State v. Brubaker* (1979), 184 Mont. 294, 602 P.2d 974.  In *Brubaker*, officers asked to speak to Brubaker about his wife's serious injuries.  They advised him of his *Miranda* rights and Brubaker consented to have his interview recorded.  After his rights were read to him, however, he commented that he felt "the seriousness of this case and it would probably be advisable for me to obtain an attorney."  He continued, however, that he did not feel he needed an attorney at that time and that he would go ahead with the statement.  *Brubaker,* 184 Mont. at 299-300, 602 P.2d at 977.  Brubaker subsequently made self-incriminating remarks that he later attempted to have suppressed.  We affirmed the district court's admission of Brubaker's statement on the ground that he had made such statement voluntarily after being advised of his rights.  The State maintains that here, as in *Brubaker*, immediately after requesting an attorney Maestas denied needing or wanting one.

9

¶17 It is well-established that a defendant may move to suppress an admission or confession on the ground that it was not voluntarily given. Section 46-13-301, MCA. Once such a motion has been made, the State must prove by a preponderance of the evidence that the admission or confession was voluntarily offered. Section 46-13-301(1) and (2), MCA. Voluntariness is a factual question that takes into account the totality of the circumstances. See *State v. Scarborough*, 2000 MT 301, ¶ 31, 302 Mont. 350, ¶ 31, 14 P.3d 1202, ¶ 31 (citations omitted). The presence of timely and complete *Miranda* warnings supports a finding of voluntariness. *Scarborough*, ¶ 33.

¶18 Based on the record in this case, we conclude that Maestas' request for counsel was ambiguous and equivocal, and that his admissions were voluntarily given. Immediately after demanding an attorney, and without interruption, Maestas told McCarthy to question another witness about what time he left the bar—"Now, give me a fucking lawyer 'cause I don't have to sit here and fucking put up with this bullshit, 'cause I ain't done nothin'. *You can ask Jim, the owner, what time we left*." Under these circumstances, it was appropriate for McCarthy to determine what Maestas truly wanted. Did he want McCarthy to attempt to corroborate his story? Or, did he want McCarthy to get him an attorney? McCarthy immediately instructed Maestas to stop talking and tell him whether he wished to have counsel present before proceeding. He asked Maestas at least six times whether he wanted an attorney and Maestas repeatedly told him that he did not. McCarthy did not pressure Maestas or discourage him from requesting counsel but rather, quite correctly, explained that he would

10

stop the interview if Maestas wanted a lawyer because he did not want to violate Maestas' rights.

¶19    As we stated in *State v. Simmons*, 2000 MT 329, 303 Mont. 60, 15 P.3d 408, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [the "no further questioning" rule articulated in *Edwards v. Arizona*[1]] does not require that the officers stop questioning the suspect." *Simmons*, ¶ 21 (citing *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371). Maestas' equivocal requests for a lawyer, followed by his repeated statements refusing the provision of counsel does not rise to the level of clarity that would mandate that McCarthy stop all questioning, especially questions seeking to clarify what Maestas really wanted.

¶20    Finally, it is also significant that the self-incriminating statements made by Maestas were not made on March 4 but rather on March 5, *after* Maestas had again been notified of, and waived, his right to counsel.  Under the totality of these circumstances therefore, we conclude the District Court did not err in denying Maestas' motion to suppress.

---

[1]  Edwards v. Arizona (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.

11

## CONCLUSION

¶21    For the foregoing reasons, we affirm the District Court.


                              /S/ PATRICIA COTTER



We Concur:


/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS